SOCONY MOBIL OIL COMPANY, INC., Mobil Oil Company, Ltd. and Mobil Oil, A. G., Plaintiffs-Appellants Cross-Appellees,

v.

TEXAS COASTAL AND INTERNATIONAL, INC., Steamtanker Padre Island, Inc., in personam, and the Steamtanker "Padre Island," her engines, tackle, etc., in rem, Defendants-Appellees Cross-Appellants.

No. 75–3479.

United States Court of Appeals,
Fifth Circuit.

Sept. 23, 1977.

H. Barton Williams, Nashville, Tenn., George Stelljes, Jr., Jacksonville, Fla., Warren H. Greene, Jr., Mobil Oil Corp., New York City, for plaintiffs-appellants cross-appellees.

James F. Moseley, Jacksonville, Fla., for defendants-appellees cross-appellants.

Glickstein, Crenshaw, Glickstein & Hulsy, Jacksonville, Fla., for Merritt-Chapman.

Arthur Roth, Miami, Fla., Adams & Adams, Jacksonville, Fla., for intervenors.

Before GEWIN, RONEY and HILL, Circuit Judges.

RONEY, Circuit Judge:

Plaintiffs successfully demonstrated to the trial court that three cargoes of their oil, loaded in good condition on the Steam-

tanker PADRE ISLAND, were contaminated with water when discharged after each voyage. Awarded $131,316.34, plaintiffs appeal the denial of prejudgment interest. Defendants cross-appeal as to liability. We reverse the denial of prejudgment interest but affirm on liability, the findings of fact not being clearly erroneous.

Plaintiffs chartered the S/T PADRE ISLAND to transport oil products to various parts of the globe. The first voyage under this charter was without incident, but each of three subsequent voyages forms a cause of action in this case. After each of those voyages, made under bills of lading, the cargo of bunker fuel oil was found contaminated with water after discharge.

█ In reviewing findings of fact, the proper placement of the burden of proof is important. Although the trial spawned an intricate dispute over whether the Carriage of Goods by Sea Act, [COGSA] 46 U.S.C.A. §§ 1300 *et seq.*, applied, at oral argument, both parties informed the Court that, in their estimation, this issue no longer makes a difference in the outcome of the appeal. Since "if bills of lading are issued in the case of a ship under charter party, they shall comply with the terms of this chapter, . . . ." 46 U.S.C.A. § 1305, and since each voyage was made under a bill of lading, we conclude that the burden of proof rules of the Carriage of Goods by Sea Act apply. 46 U.S.C.A. § 1304(1) provides the proper burden of proof allocation: "Whenever loss or damages has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier . . . ."

█ In a case of this kind, the shipper need only show that cargo was loaded in undamaged condition, and discharged in contaminated condition, to establish a *prima facie* case. The carrier then has the burden of showing that the vessel was seaworthy or that due diligence was used to make it seaworthy. *United States v. Lykes Bros. Steamship Co., Inc.*, 511 F.2d 218 (5th Cir. 1975); *M. W. Zack Metal Co. v. S. S. Birmingham City*, 311 F.2d 334 (2d Cir. 1962), *cert. denied*, 375 U.S. 816, 84 S.Ct. 50, 11

L.Ed.2d 51 (1963). This, together with Rule 52(a), Fed.R.Civ.P., which prevents an appellate court from disturbing the findings of a trial court unless clearly erroneous, even if the appellate court might have reached different conclusions on the evidence, frames the consideration of the factual arguments made on this appeal.

### *Venezuela—New York*

On October 8, 1965, the PADRE ISLAND loaded a cargo of fuel at El Palito, Venezuela, destined for Staten Island and Albany, New York. Before the cargo was loaded the cargo tanks were examined and found to be free of water. Tests of the cargo before loading revealed insignificant water content.

The PADRE ISLAND discharged a portion of its cargo in New York City without incident. The balance of the cargo was discharged at Albany. The cargo was not tested in the vessel's cargo tanks before discharge but was tested some time later from the shore tanks at Mobil's Albany facility. At that point the cargo was found to be contaminated with water.

The district court concluded that the crew of the PADRE ISLAND had taken cargo and placed it in its own fuel tanks, and substituted water into the cargo tanks, thus contaminating the cargo. The evidentiary support for this finding was the testimony of the supervisor of the Mobil Albany facility. The testimony was based on what a watchman had told the night supervisor, who then had reported to the witness. The defendants press upon this Court the hearsay nature of the testimony thus relied upon. They also contend that the plaintiffs failed to make a *prima facie* case in that the proof of contamination of cargo was too distant from time and place of discharge to indicate whether contamination was caused on the vessel or due to water existing in the shore tanks before discharge. *See Miami Structural Iron Corp. v. Cie Nationale Belge De T. M.*, 224 F.2d 566 (5th Cir. 1955).

█ The hearsay problem complained of by the defendants is not without merit. It

overlooks, however, the limited elements which the plaintiffs were required to prove in order to recover. If the evidence sufficiently demonstrates that the oil was "dry" when loaded in Venezuela, and had significant water content when discharged in Albany, the defendant was obliged to come forward and explain why. The explanation of the plaintiffs that it was due to a pilfering of cargo by the ship was a gratuitous one which they were not obliged to advance. Since the defendants did not offer, as to this voyage, any evidence to show that the cause of the damage was within one of the exceptions to carrier liability found in the Carriage of Goods by Sea Act, this Court need only review the findings of cargo condition on loading and discharge to determine if the award for plaintiffs can be affirmed.

There is ample evidence to show that the cargo was loaded in good condition. Not only did plaintiffs introduce chemical tests of the cargo taken from its Venezuelan tanks before loading, but the cargo was in sound condition when the ship arrived in Staten Island, thus permitting the inference that it was sound when loaded. It is the question of the cargo's condition on discharge that is difficult. Defendants maintain that since the only evidence as to contamination came from samples taken from shore tanks two days after discharge of the cargo, plaintiffs did not make out a *prima facie* case. The cases they rely on, however, are not apposite.

For instance, defendants rely on *Miami Structural Iron Corp. v. Cie Nationale Belge De T. M.*, 224 F.2d 566 (5th Cir. 1955). That case concerned a cargo of steel, which was not inspected until five or six days after discharge. The Court held that there was a failure to prove that the goods were discharged in a damaged condition, instead of having been damaged after discharge. Defendants argue from this case that it is impossible to tell, on the facts before us, whether the cargo of oil discharged in Albany was contaminated on discharge, or was contaminated by events which occurred subsequent thereto. This ignores, however, the intrinsic difference between a cargo of steel and one of fuel oil. Steel will naturally deteriorate if left exposed to the elements for a period of time. While the nature of the damage to the cargo is not specified in *Miami Structural*, the type of cargo there involved suggests that the damage must have been some form of rusting or warping. These are conditions which would be exacerbated if the cargo is left uninspected for a period of days after discharge, rendering a finder of fact unable to determine if the damages occurred on board the transporting vessel, or subsequently. Here, since it is undisputed that the cargo was discharged into a covered tank, the amount of time which passes prior to inspection does not increase the likelihood that the cargo will be damaged due to water contamination. The same two alternatives continue to be present. The water was either introduced on board the vessel, or was preexisting in the shore tank. *Cf. Empire Aluminum Corp. v. S. S. Korendijk*, 391 F.Supp. 402, 1974 A.M.C. 2213 (S.D.Ga. 1973) (equally likely that possibly uncovered aluminum cargo was damaged after discharge as by sea water while on vessel).

■ The district court was thus faced with two possibilities. In drawing an inference, however, the court could recognize the fact that absent evidence to the contrary it would be unusual for an oil company to maintain shore tanks so that they had large quantities of water in them just prior to the receipt of a cargo of oil. Furthermore the court's implicit conclusion that there was no water preexisting in the shore tanks at Albany, and that the water was introduced prior to the discharge of the cargo from the ship is a finding which we may disturb only if clearly erroneous. Fed.R.Civ.P. 52. Any source of doubt on this issue is precluded by the testimony of Joseph Lombardo, a Mobil Oil laboratory technician. He testified as follows:

Q: Do your books and records reflect what the condition of tank 15 was before the PADRE ISLAND arrived? [Tank 15 is the Albany shore tank into which the cargo was discharged].

A: Off hand, I would say it was empty.

Q: Now, when you say empty, you mean it didn't have any petroleum product in it?

A: Any product in it. I didn't go in and look; I didn't know.

Considering the evidence as to the ship's condition, introduced as to the subsequent counts of the complaint, and the strong likelihood that Mobil maintained its shore tanks free from water, the conclusion of the district court that the cargo left the vessel at Albany in a contaminated condition is not reversible.

■ Defendants also argue, on the strength of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(6) that the failure of Mobil to have given notice of the cargo damage within three days of discharge, is *prima facie* evidence that the goods were discharged in good order. This argument misconstrues the nature of the statute. It is conclusive only where there is no other evidence on the disputed point. Once the plaintiffs come forward with sufficient evidence to suggest that the cargo was contaminated before discharge a fact issue is created, which the Court must resolve. As we have concluded above that the resolution of the fact issue in the instant case was not clearly erroneous, the § 1303(6) 3-day notice provision has no bearing on the outcome of the case.

### Venezuela—England

After leaving Albany, the PADRE ISLAND returned to Venezuela and loaded another cargo of fuel oil. This cargo was tested in the shore tanks prior to loading and was discovered to contain only 0.7%, or a "trace," of water. When the vessel arrived in England it encountered rough weather. It was also determined that with her cargo load the PADRE ISLAND's draft was too deep to permit her to dock. It was thus necessary to lighten the vessel. This procedure was performed by having the vessel discharge a portion of the cargo into each of three barges which then discharged the fuel oil into shore tanks. Although no tests were run on the barge tanks or on the

various pipes which transported the cargo to the shore tanks, a composite sample was taken from the tanks of the PADRE ISLAND itself. After tests were performed on this sample by Mobil chemists, it was determined to have a water content of 4%. There was expert testimony that oil with such a water content is commercially unusable. Subsequent testing by independent chemists from the shore tanks disclosed an even higher water content.

■ The defendants offered no evidence substantially contradicting this description of events, and thus the conclusions of the trial court that the cargo had been loaded in good condition and discharged in contaminated condition are not clearly erroneous. The plaintiffs went further, however, and adduced proof as to the unseaworthiness of the vessel. As one witness testified:

When we got out to the ship—and this is a very vivid recollection—I have never seen a worse looking ship in my life than this particular vessel. She was smothered in thick rust; you could hardly see any paintwork on her. The ladders from the deck to the flying bridge, most of them were hanging off. The Butterworth plates on the deck, some of the studs were sheared off, and an awful lot of the nuts were missing from the studs that were there.

In the face of this type of testimony a conclusion that no due diligence was used to make the vessel seaworthy is also amply supported.

■ The defendants advance two contentions which they claim absolve them from liability on this voyage. First they argue that plaintiffs "failed to prove ownership of the cargo or any right thereto," as to this particular voyage. However, there was testimony that "Mobil Oil Company Limited was the recipient and owner of the oil when it passed the flange of the vessel." This evidence was sufficient to show that this oil belonged to one of the plaintiffs.

The defendants also claim that a report prepared by Captain Graham Thompson, a Mobil employee who inspected the vessel on

its arrival in England, negates the possibility that the water was introduced into the cargo during the voyage. Based on a series of mathematical computations that report concludes that "The water in the cargo was there when the vessel started." Of course plaintiffs concede that there was a trace of water in this shipment of oil, however, it is their position, notwithstanding this report, that the bulk of that water was introduced during the voyage. The conflict between this report, and the chemical tests made when the cargo was loaded creates a factual dispute, which the district court resolved in favor of the plaintiffs. Furthermore, the plaintiffs point out that Thompson's report is based on his assumption that the vessel started the voyage with substantially the same quantity in her cargo tanks as she had on arrival in England. This assumption flies in the face of a stipulation of fact made by the parties which indicated that the ship discharged approximately 1,000 long tons more cargo than she loaded. It was thus permissible for the district court to conclude, as the plaintiffs argue, that the failure of Captain Thompson's premises served to void his conclusion that the PADRE ISLAND sailed with water in the cargo. The findings as to this voyage are therefore affirmed.

### France—Germany

From England, the PADRE ISLAND proceeded across the channel to France where it then loaded another cargo of fuel oil, tested for water before loading by a Mobil chemist. The result of that test established a virtually insignificant water content of 0.1%. The vessel then departed for two ports in Germany, the first of which was Ostermoore. On discharge, this cargo was placed in shore tanks number 2 and 10 and test samples were drawn. As a result it was determined that the oil in tank 2 contained 0.5% water, which was satisfactory, but that the water content of the oil in tank 10 was 2.8% which rendered the oil unfit for commercial uses. The vessel then proceeded on to Einswarden, Germany, where additional cargo was discharged and similarly found to have elevated water content. These later tests were performed on samples drawn from the ship's cargo tanks. The water in these two cargo discharges was found to have some salt content, although not as much as would normally be found in sea water.

The defendants put on no evidence to contradict any of the testimony proffered by the plaintiffs on the condition of the oil before loading and after discharge. It is thus clear that the conclusion of the trial court that the plaintiffs had satisfied their burden is not clearly erroneous.

To further substantiate its theory that the damage to its oil was caused by the poor condition of the PADRE ISLAND, the plaintiffs elicited testimony from an expert witness as to the condition of the ship, and introduced a series of photographs which were taken some months after the final voyage with which we are here concerned. This evidence, although contested, amply supports the ultimate conclusion of the district court that defendants did not use due diligence to make their vessel seaworthy, particularly since the defendants have the burden of proof on this issue. Although defendants argue that the plaintiffs never demonstrated the causal connection between the defects of the vessel and the damage to the cargo, it was not its obligation to do so. Once it successfully demonstrated that the cargo was loaded in good condition, and discharged in damaged condition, the burden was on the defendants to show that the cause of the damage was one of the risks for which carriers are not liable. Its failure to do this supports the judgment for the plaintiffs.

### Damages

Defendants challenge the inclusion in the damage award of several specific items. This Court has observed that "[g]reat latitude is given the trial judge in awarding damages, . . ." *Drake v. E. I. DuPont deNemours & Co.*, 432 F.2d 276, 279 (5th Cir. 1970). The plaintiffs submitted in support of their claims numerous receipts and other documentation of ex-

**1014**

penses incurred in rectifying the problems caused by the cargo contamination. Defendants have failed to demonstrate that the damage award should be disturbed on this appeal.

### Prejudgment Interest

■ Mobil, in its direct appeal, seeks relief from the district court's decision to deny prejudgment interest. In admiralty, interest should be granted unless there are exceptional or peculiar circumstances. *American Zinc Co. v. Foster*, 441 F.2d 1100 (5th Cir.), *cert. denied*, 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971); *Mid-America Transportation Co., Inc. v. Rose Barge Line, Inc.*, 477 F.2d 914 (8th Cir. 1973). Prejudgment interest is not awarded as a penalty, but is in the nature of compensation for the use of funds. *See Rosa v. Insurance Company of the State of Pennsylvania*, 421 F.2d 390, 393 (9th Cir. 1970). In the instant case the defendants have had the use of money during the entire period of this protracted litigation, to which the plaintiffs have ultimately been found entitled. Nonetheless, the district court concluded that prejudgment interest should not be awarded here because of "[t]he complex nature of these consolidated cases, the extensive discovery required, the stay required because of [a] pending related Texas case and the delay attributable to the Court's crowded trial docket, which circumstances occurred without the fault of the defendants."

■ Trial delays not caused by the plaintiffs do not constitute "the exceptional or peculiar circumstances needed to negate an interest award." Defendants' lack of fault is not compelling. The plaintiffs were not responsible for delay. They cannot be charged with either the complexity of the case or the condition of the court's docket.

Although there was a great deal of discovery, much of it resulted in depositions which were ultimately read into evidence at the trial. Many of these depositions were of persons residing in Europe. The inherent delay flowing from the need to secure the testimony of these parties is not the type of exceptional circumstance which warrants the denial of interest. The stay of proceedings which delayed the disposition of this case for some three years was not sought by the plaintiffs, nor is there a suggestion that it was a frivolous or dilatory maneuver engaged in for tactical advantage. Other than these delay related factors there has been no indication of impropriety on the part of the plaintiffs. There are thus insufficient extraordinary circumstances to justify the denial of prejudgment interest, even under the abuse of discretion standard of review. The case is remanded to the trial court for assessment of prejudgment interest.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.