ASSOCIATED METALS AND
MINERALS CORP., Plaintiff,

v.

ETELAE SUOMIN LAIVA, Defendant.

No. 85–376–Civ–J–12.

United States District Court,
M.D. Florida,
Jacksonville Division.

Aug. 18, 1987.
As Amended Oct. 8, 1987.

Edward F. Gerace, Tampa, Fla., for plaintiff.

Robert E. Warren, Jacksonville, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MELTON, District Judge.

Plaintiff Associated Metals and Minerals Corporation brought this action against Etelae Suomin Laiva for loss and damage to a cargo of steel shipped from Finland to the United States aboard the M/V Arkadia. The cargo consisted of steel coils and steel plates. It was loaded in the ports of Raahe and Helsinki, Finland, in December 1983. Discharge of the cargo occurred in Jacksonville, Florida, and Houston, Texas, in January 1984.

Plaintiff claims that defendant was responsible for freshwater rust incurred by steel coils, because defendant loaded the coils in holds which contained cargo that had been loaded with snow and ice on it. According to plaintiff, the snow and ice enhanced the moisture in the cargo hold and was, at a very minimum, a concurrent cause of the rust. Plaintiff also claims losses for the short delivery of certain steel plates. Specifically, the following claims are alleged:

(1) Freshwater rust to steel coils, bills of lading 44J to 49J (Helsinki to Jacksonville), $62,193.76 (Counts I and II);

(2) Physical damage and short delivery of steel plates, bills of lading 63H and 64H (Raahe to Houston), $5,373.87 (Counts VII and VIII);

(3) Physical damage and short delivery of steel plates, bills of lading 66H, 68H, and 69H (Raahe to Houston), $2,407.32 (Counts IX and X);

(4) Freshwater rust to steel coils, bills of lading 150H through 160H (Helsinki to Houston), $9,812.37 (Counts XI and XIII);

(5) Freshwater rust to steel coils, bills of lading 145H, 172H, 174H, 175H, and 176H (Helsinki to Houston), $34,689.64 (Counts XIII and XIV).[1]

Defendant denies liability as to the claims for freshwater rust damage to steel coils. Initially, defendant asserts that no damage was inflicted on the cargo while it was in its possession. Alternatively, defendant argues that if such damage is proven, it was not the result of any fault or negligence on its part.

This matter was tried on October 22–23, 1986, and on December 18, 1986. At that time, testimony was received from surveyors who had been employed by both plaintiff and defendant and from independent surveyors and experts. Additionally, numerous photographs and documents were introduced into evidence. The Court has fully considered the believability of the testimony presented, including the credibility of the witnesses, and has also carefully reviewed the photographs and other documentary evidence. Based thereon, the Court finds that plaintiff has failed to demonstrate by a preponderance of the evidence that the freshwater rust damage incurred by the steel coils was a direct result of defendant's negligence. In so holding,

---

1. The other claims initially asserted by plaintiff were dismissed at the close of plaintiff's case.

T.T. at 228–29; *see* Order entered October 23, 1986.

the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The vessel Arkadia, at all times material hereto, was owned by defendant. Defendant charted the vessel to the shipper of the cargo herein at issue, Rautaruukkii Oy, for a voyage from Finland to the United States. *See* Pretrial Stipulation at p. 7.

2. At all times material hereto, plaintiff was a corporation that purchased steel for importation to the United States. The cargo herein at issue was sold by Rautaruukkii Oy to Metallund Rohstoff AG, who in turn sold it to Asoma Steel, Ltd. ("Asoma"). Plaintiff then purchased the steel from Asoma. *See* Plaintiff's Exhibits 2, 3, 4. This steel was shipped to the United States on the Arkadia. *See* Plaintiff's Exhibit 1.

3. From December 9, 1983, through December 17, 1983, the Arkadia called on the port of Raahe to load a portion of the cargo. *See* Plaintiff's Exhibit 6. The loading operation was attended by a surveyor who noted at the commencement of the loading that all the vessel's holds were dry and clean. *Id.* at p. 3. The cargo loaded in Raahe consisted of coils, plates, and pipes. The coils and plates had been stored in outside storage and were covered with ice and snow or were partly rusty before loading. *Id.* The temperatures in Raahe during the loading ranged from − 22°C to + 2°C, causing heavy frost on the plates and coils. *Id.* The loading in Raahe was conducted by Rautaruukkii Oy, and the bills of lading issued by Rautaruukkii Oy were claused to show this condition. *Id.*

4. The vessel's second loading port was Helsinki, where she loaded cargo between December 19, 1983, and December 23, 1983. *Id.* at p. 4. The recorded temperatures in Helsinki during the loading period ranged from a high of + 3°C to a low of − 2°C. *Id.* The cargo loaded in Helsinki consisted of cold-rolled steel coils and galvanized steel coils, which are the subject of plaintiff's rust claim. *See* Plaintiff's Exhibits 8B, 9C, 12a, 12b, 12c. The cold-rolled steel coils loaded in Helsinki were placed on top of steel plates that had been taken aboard in Raahe. T.T. at 160, 183. These coils were eventually discharged in Jacksonville and are the subject of the claim under Counts I and II of the Complaint.

5. After the cargo had been loaded, the vessel departed Finland for the United States with its first port of call Jacksonville, Florida. During the voyage the vessel encountered extremely heavy and boisterous weather. Wind forces were from eight to ten on the Beaufort scale. T.T. at 140. The vessel was taking seas on deck. T.T. at 162. This condition persisted for most of the voyage; thus the vessel was unable to ventilate the cargo for fear that saltwater might get into the cargo compartments. T.T. at 160–63.

6. The vessel arrived in Jacksonville, Florida, on or about January 11, 1984. The cargo destined for this port was carried pursuant to bills of lading 1J through 49J and was discharged from holds number two and number five. T.T. at 158–59. The notation "plates partly wet" had been made in Raahe with regard to the cargo carried under bills of lading 1J through 43J. *See* Defendant's Exhibits 7 and 9. As noted above, this cargo, consisting of steel plates, had been stored in outside storage and was loaded in a wet condition. There was, however, no claim for rust damage as to this cargo. Under bills of lading 44J through and including 49J, a total of 97 coils of cold-rolled carbon steel were shipped from Helsinki to Jacksonville. *See* Plaintiff's Exhibit 8B. With regard to these bills of lading, the surveyor noted the exceptions which had been taken in Helsinki as to physical damage. T.T. at 158–59; *see also* Plaintiff's Exhibit 6.

7. Three experienced marine surveyors, Captain Robert J. Richards, Captain C.C. Buck, and Ken Hamilton, attended the vessel in Jacksonville, as well as a representative of plaintiff. When the hatches were opened, the hatch covers, coamings, and gaskets were found to be in excellent condition. There was no evidence of saltwater incursion. *Id.* No moisture was found in the lower section of the hold. The cargo showed no signs of shifting or damage

during transit. T.T. at 169, 202. A very light surface scale rust was found on the coils and on the steel. T.T. at p. 160.

8. Captain Robert J. Richards conducted a hatch survey on behalf of the discharging stevedore, Strachan Shipping. T.T. at 157. Captain Richards was present when the number two hatch, in which the 97 coils carried under bills of lading 44J to 49J, was opened. T.T. at 159. He described the physical condition of the 97 coils as good. There was light to moderate rust on the covers, and there was evidence of condensation in the compartment, on the surface of the cargo in stow, and on the overheads. T.T. at 160–63.

9. From all appearances, Captain Richards was of the opinion that the custody of the cargo provided by the shipowner was good. He saw no indication that the vessel owner, the officers, or the crew had failed to exercise due diligence for the care of the cargo. T.T. 167–70. Furthermore, the conditions he encountered did not suggest that the interior steel of the 97 coils was affected by rust. T.T. at 171.

10. Captain C.C. Buck attended the discharge in Jacksonville on behalf of plaintiff. *See* Plaintiff's Exhibit 5. He conducted a general outturn survey and was in attendance at the discharge approximately 60% of the time. T.T. at 140. Captain Buck found the vessel to be in excellent condition. T.T. at 200. The interior hatch coamings and the sides of the holds were clean and dry with no rust streaks or indications of water leakage. *See* Plaintiff's Exhibit 5 at p. 2. All of the cargo was well stored. T.T. at 200. The bottom of the cargo hold was dry. T.T. at 201. After examining the cargo destined for Jacksonville, Captain Buck noted it to be in excellent physical condition though generally rusted to varying degrees. *See* Plaintiff's Exhibit 5 at p. 2. The heaviest rust, however, was found on the plates, not on the steel coils. *Id.*

11. Captain Buck found that the 97 coils involved here were well secured, resting on 4' × 4' wood dunnage on top of the steel plates. T.T. at 209–10; Plaintiff's Exhibit 5. The coils were packaged with a metal covering around the outer and inner diameters and around each end, with a metal edge guard around the outer and inner diameter edges, all bound with six metal straps through the eye of the coil and three metal straps around the outside diameter. Plaintiff's Exhibit 5. This is standard packaging for this product. He noted that many of the metal wrappers were rusted to various degrees but, in general, the consignment of coils appeared to be in good condition. T.T. at 202.

12. The weather conditions at the commencement of discharge in Jacksonville were heavy overcast with light mist. Conditions gradually worsened until a light drizzle commenced and the discharge was stopped. T.T. at 165. The hatch covers were then closed. The weather later improved and the discharge resumed. Discharge was again stopped due to rain but was finally completed on January 14, 1984. T.T. at 133.

13. Ken Hamilton, the surveyor for defendant, considered the surface rust he saw minimal and not detrimental to the use of the steel products. *See* Defendant's Exhibit 7 at p. 2. The Captain told to Mr. Hamilton, as noted in his survey report, that some of the cargo was loaded wet in Helsinki. *Id.* at p. 3.

14. Subsequent to discharge, Captain Buck examined the 97 coils in Port Carriers' warehouse and found that many of the covers were wrinkled, crumpled, and torn, with numerous bands either broken or missing. Captain Buck was able to identify approximately twenty coils that were severely damaged. He testified, however, that he had listed only those coils which had been inflicted with a great deal of damage although others indeed had been affected. Captain Buck attributed this physical damage to rough handling by the stevedores during the discharge and subsequent stowage in the warehouse. T.T. at 204–10.

15. The coils of steel remained in the warehouse operated by Port Carriers, Inc., *see* Plaintiff's Exhibit 21, until they were transported by truck to their ultimate destination, National Steel Service Center, Nor-

cross, Georgia. This transportation was arranged on behalf of plaintiff. The loading reports of Port Carriers, Inc., show that the coils were shipped out of Port Carriers' warehouse two coils at a time, commencing on January 24, 1984. Most of the cargo had left the custody of Port Carriers by February 17, 1984. At least three coils, however, were not removed until March 26, 1984, and April 12, 1984. *See* Plaintiff's Exhibit 21.

These coils were surveyed by Henry Feste, a marine surveyor, in the covered warehouse of National Steel in Norcross, Georgia on February 27, 1984. *See* Plaintiff's Exhibit 8c; *see also* Plaintiff's Exhibit 16 at p. 8. Mr. Feste found that ten of the 97 coils had already been slit. Eighty-five coils had been decanned and only two coils were in the original containers. *Id.* at p. 10. Mr. Feste discovered that the coils were rusty or water stained. All of the coils had been affected to some extent.

Although Mr. Feste does not approve, he is aware that shipping cargo covered with snow and ice is a common practice. *Id.* at pp. 15–16. With regard to this particular cargo, Mr. Feste was of the opinion that the rust was caused by exposure to freshwater. *Id.* at p. 10, 12. He offered no opinion, however, as to when the cargo was exposed to freshwater. *Id.* at p. 24, 39. Mr. Feste was unable to verify that the 97 coils he inspected were indeed the same coils carried aboard the Arkadia. *Id.* at 24–26. Rather, he trusted representations made to him by National Steel. *Id.* Mr. Feste agreed to a depreciated value of $17 per cwt., an amount he considered fair and reasonable. This represents a loss of $3.58 per cwt. from the invoice value of $20.58, *see* Plaintiff's Exhibit 8D, and a loss of $62,193.73 against the agreed invoice price (sale price) between plaintiff and National Steel Service Center. *See* Plaintiff's Exhibit 8A.

16. The Arkadia arrived in Houston on January 19, 1984. She discharged her cargo through January 27, 1984. Plaintiff's Exhibit 7. On January 19 and January 20, the discharge was interrupted by inclement weather. *Id.* Because of the damage inflicted by the stevedore in Jacksonville, defendant retained Captain Brian Martin, a marine surveyor, to attend the outturn in Houston. T.T. at 68–69, 256. Captain Martin noted that bills of lading 1H through 99H had been issued for cargo loaded in Raahe, and that the cargo had been kept in open storage and was presented to the vessel with snow and ice on it. Plaintiff's Exhibit 7. It was Captain Martin's opinion that this is a common occurrence for shipments out of Northern Europe during the winter and noted that it ordinarily does not occasion the rejection of the cargo. According to Captain Martin, it is proper for the vessel to accept the cargo and cause the bills of lading to reflect the atmospheric conditions, as was done in this case. T.T. at 258. It is not customary for the crew of the vessel to attempt to improve the condition of the cargo presented to it. T.T. at 258–59.

Captain Martin, upon his inspection of the steel coils, found rust on the exterior covers and further discovered that some of the coils were wet. Considering the nature and custom of the shipping trade, the time of year, and the conditions under which this particular cargo had been carried, the outward appearance and condition of the coils did not surprise him. T.T. at 258–59.

17. Discharge in Houston was also attended by Norman Goldsmith on behalf of plaintiff. Plaintiff's Exhibit 14 at p. 6. Prior to discharge, Mr. Goldsmith observed light to medium rust on the cover of the coils. *Id.* and exhibit PX–1 attached thereto. He also noted that during outturn, various coil covers were torn or dented due to the stevedore's discharge operations. Mr. Goldsmith found that many of the coils of steel had water in their outer rims when they were removed from the holds. *Id.* at pp. 24–25 and exhibit PX–1 attached thereto. Noting that the air temperature at the time of loading was approximately − 22°F and that during transit around the Florida peninsular temperatures reached + 80°F, Mr. Goldsmith attributed the wetness to atmospheric changes during transit. It was his opinion that this caused heavy sweat to form on the coils. *Id.* He made no notation of any other condition or condi-

tions which might have contributed to the moisture on the cargo. T.T. at 74–78.

18. Four claims have been asserted with regard to the cargo discharged in Houston. The first is for physical damage and short delivery of steel plates carried under bills of lading 63H and 64H. *See* Plaintiff's Exhibits 10a, 10b, 10c, 10d. With regard to this claim, an amended customs declaration was filed which verifies the short delivery. Although there is no indication that the vessel sailed from Houston with any cargo aboard, defendant was unable to establish that the cargo was discharged from the vessel and subsequently lost.

19. The second claim is for physical damage and short delivery of steel plates carried under bills of lading 66H, 68H, and 69H. *See* Plaintiff's Exhibits 11a, 11b, 11c, 11d. An amended customs declaration also verifies this short delivery.

20. The final two claims with regard to the cargo destined for Houston are for freshwater rust damage. The first is for cargo ultimately consigned to Triple J. Steel Corporation. This cargo consisted of 94 coils and was carried pursuant to bills of lading 150H through 160H. A damage survey of this cargo was conducted by Norman Goldsmith on May 1, 1984, approximately three months after it had been offloaded. Plaintiff's Exhibit 14 at p. 19. During the survey, he found that six coils had been affected, for which he allowed a 15% depreciation in value. The remaining coils were run and a small portion, approximately 5% of the total weight, was affected and was depreciated 50%. *Id.* (exhibit PX–3 attached thereto). Mr. Goldsmith attributed this damage to sweat which had formed while the cargo was in stow aboard the vessel. Plaintiff's Exhibit 6. It should be noted that four coils shipped under these bills of lading had been identified as having been physically damaged at the time of loading. *See* Plaintiff's Exhibit 6. Additional coils were damaged during discharge.

21. The last claim was for cargo shipped from Helsinki to Houston and carried under bills of lading 142H–149H and 172H–177H. This cargo was transported from the pier apron to Thyssen Metals Service and stored in a heated warehouse immediately after discharge. However, it was not surveyed until June 8, 1984, five months after discharge. Mr. Teel, an employee of Thyssen, testified that steel coils are stored in a heated warehouse because otherwise they will rust under the humid conditions existing in Houston. T.T. at 27–28.

Mr. Goldsmith and Captain Martin surveyed the steel at the Thyssen warehouse on June 8, 1987. Mr. Goldsmith reported that nineteen coils had been affected completely and other coils had been affected to a lesser degree. These coils were sold at salvage; a claim of $34,689.64 remains. Plaintiff's Exhibit 14 at p. 9 and exhibit PX–2 attached thereto.

22. No claim has been made for any of the steel which was carried under the claused bills of lading. Also, there is no indication when notice of claim was given to the carrier. It must be assumed, however, that no notice was given prior to the surveys conducted by Mr. Goldsmith.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the dispute pursuant to Rule 9(h), Fed.R.Civ.P. and 28 U.S.C. § 1332.

2. Liability for damage to cargo carried to and from ports in the United States in foreign trade is controlled by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* ("COGSA"). COGSA is basically a bailment statute. To prevail, a plaintiff must prove the cargo at issue was damaged while in the custody of the ocean carrier pursuant to a contract of carriage. The term "carriage" covers the period of time from when the goods are loaded aboard the vessel until they are discharged. 46 U.S.C. § 1301(e).

3. A plaintiff has the initial burden of establishing that the cargo in question was delivered to the carrier in good condition and that it was discharged in a damaged condition. To the extent the plaintiff satisfies this burden, the burden of proof

then shifts to the defendant-carrier to establish that the damage did not result from any fault or neglect on its part, or that the damage did in fact result from one of the statutory exceptions set forth in 46 U.S.C. § 1304. *See Socony Mobil Oil Co. v. Texas Coastal & International, Inc.,* 559 F.2d 1008, 1010 (5th Cir.1977); *Tupman Thurlow Co. v. S.S. Cap Castillo,* 490 F.2d 302, 303 (2d Cir.1974).

4. The defendant-carrier may also prove that the cargo was not in fact damaged while in its possession. *American Tobacco Co. v. Katingo Hadjipatera,* 194 F.2d 449, 451 (2d Cir.1951).

5. Finally, the defendant-carrier has the right to put the plaintiff to its proof and for its defense stand upon the insufficiency of the evidence of delivery of the cargo to the carrier in good condition or the discharge of the cargo in a damaged condition. The plaintiff's failure to prove either one or both of these conditions relieves the defendant-carrier of going forward with proof of actual care and custody of the cargo. *See Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Modial United Corp.,* 316 F.2d 163, 169 (5th Cir.1963).

6. Section 1303(3)(c) of Title 46 of the United States Code requires that the carrier, upon receiving the goods, issue to the shipper a bill of lading showing, among other things, the "apparent order and condition of the goods." In most instances, therefore, to prove the condition of the cargo at the time of delivery to the carrier, a plaintiff may use the bill of lading issued by the carrier. Introduction of a "clean" bill of lading is usually sufficient to establish the "apparent" condition of the cargo at the time of delivery.

Defendant argues that when the nature of a commodity is such that its internal or true condition is not adequately revealed by its external appearance, plaintiff must go further to establish the good order and condition of the goods at the time of delivery. *See Mondial United Corp.,* 316 F.2d at 170; *The Niel Maersk,* 91 F.2d 932, 933–34 (2d Cir.1937). Therefore, according to defendant, plaintiff may not merely rely on the bill of lading to establish its *prima facie* case but must present evidence of the actual condition of the cargo at the time of loading.

7. In the case of perishable property, "or when the goods themselves contain some basic, inherent, and hidden defect, a clean bill of lading is not enough." *C. Itoh & Co. v. Hellenic Lines, Ltd.,* 470 F.Supp. 594, 596, 597 (S.D.N.Y.1979). Steel coils, however, are not perishable in nature, nor are they infected with an inherent vice which results in rust. *Konfort, S.A. v. S.S. Santo Cerro,* 190 F.Supp. 1, 7 (S.D.N.Y.1960) is instructive on this issue. In that case, the court recognized that in some instances reliance on a clean bill of lading as evidence of the condition of steel coils upon delivery is justified. The Court noted that "[i]t seems hardly likely that [a steel manufacturer] ... would deliberately wrap and tie up [steel] it knew to be rusty, and not just one reel but several hundred." *Id.* at 7. The evidence in this case, like that presented in *Konfort,* does not suggest that moisture came into contact with the steel coils prior to their packaging. The bills of lading for the coils loaded in Helsinki contained no notations or exceptions to the good order and condition of the steel coils. Defendant suggests that these bills of lading address only the condition of the protective covers. While this may be in fact correct, the Court infers that the condition of the covers tends to show that the coils received proper treatment from the time they left the factory until they were delivered to the port for loading on the Arkadia. The Court finds, therefore, that plaintiff has met the burden of proving that the steel coils were delivered to the carrier in good condition.

Section 1303(6) of COGSA provides as follows:

> Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be *prima facie* evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of delivery.
>
> ....
>
> In the case of any actual or apprehended loss or damage, the carrier and the receiver shall give all reasonable facilities to each other for inspecting and tallying the goods.

The purpose of this provision is to allow the carrier an opportunity to investigate a claim while it is fresh and his witnesses are still available so that he may defend him-

self against groundless or exaggerated claims. *Miami Structural Iron Corp. v. Cie Nationale Belge De T.M.*, 224 F.2d 566, 569 (5th Cir.1955) (citation omitted); *see also Associated Metals and Minerals Corp., v. M/V Rupert De Larrinaga*, 581 F.2d 100, 101 (5th Cir.1978). Section 1303(6) places responsibility for giving notice upon the receiver of the cargo. If the damage to the cargo is apparent at the time of receipt, the receiver is to give written notice to the carrier at once. When the damage is not apparent, the receiver has three additional days within which to provide the carrier with written notice. Failure to give this written notice carries with it a presumption that the cargo was discharged from the vessel in the condition described in the bill of lading. *M/V Rupert De Larrinaga*, 581 F.2d at 101.

The presumption of good delivery when no notice is given, however, is conclusive only when there is no other evidence on this disputed point. Once plaintiff comes forward with sufficient evidence to suggest that the cargo was damaged while in the carrier's possession, the presumption disappears from the case, and the evidence of lack of notice is accorded no special weight. *Harbert International Establishment v. Power Shipping*, 635 F.2d 370, 373 (5th Cir.1981); *Socony Mobil Oil Co.*, 559 F.2d at 1008, 1013.

■ The evidence presented by plaintiff to overcome this presumption was the observations of surveyors Brian Martin and Norman Goldsmith that the coils of steel had water pouring from them while they were being discharged in Houston. *See* Plaintiff's Exhibits 7 and 14. Additionally, plaintiff relies on the testimony of surveyors and expert witnesses that moisture has a deleterious effect on cold-rolled and galvanized steel. *See, e.g.*, T.T. at 72, 143. Upon consideration of this evidence, the Court is of the opinion that plaintiff has failed to rebut the *prima facie* evidence that the goods were delivered as described in the bills of lading. *See* 46 U.S.C. § 1303(3)(c).

9. It is common knowledge in the maritime industry that cold-rolled steel brought from cold northern climates in winter to the South Atlantic and Gulf states will show evidence of condensation or sweat. *See, e.g.*, T.T. at 219, 258–59. This condensation is inevitable regardless of the ventilation supplied. It is a condition which is unavoidable and expected. Plaintiff's Ex-

hibit 14; T.T. at 162–65, 283–84. Based upon the evidence presented, the Court concludes that it was inevitable that condensation or sweat was going to occur with regard to this cargo due to the very low temperatures at the time it was loaded, and the the warm climate to which it was shipped.

The Court's conclusion is supported by the testimony of the surveyors who attended the offload in Jacksonville. Each of the surveyors who attended the vessel in Jacksonville commented that the condition of the cargo appeared to be good and none of them noted any excess moisture. In fact, they denied any evidence of excessive moisture. T.T. at 160–63, 169, 200, 202, 201. The ones who were available to testify commented that the condition of the cargo hold was as they would have expected it to be. Norman Goldsmith, who attended the outturn in Houston, attributed the sweat only to the severe change in temperature from Finland to Houston. *See* Plaintiff's Exhibit 14 at pp. 24–25 and exhibit PX–1 attached thereto. Captain Buck did not anticipate that there was any damage to the cargo. T.T. at 202.

Based on the above, it appears to the Court that plaintiff failed to come forward with sufficient evidence to suggest that the cargo was damaged while in the possession of the carrier.

■ 10. Assuming arguendo that plaintiff had successfully rebutted the *prima facia* showing that the goods were offloaded in good condition, the Court concludes that plaintiff still would not be entitled to recovery. If cargo is received in good order and is offloaded in bad order, the burden shifts to the carrier to show that the damage was the result of an excepted cause under § 1304. *Mondial United Corp.*, 316 F.2d at 169. Defendant in this action relies on the following exceptions: (1) the damage resulted from perils of the sea (inability to ventilate), 46 U.S.C. § 1304(2)(c); (2) the inherent vice of the goods (steel sweats and rusts), 46 U.S.C. § 1304(2)(m); (3) the insufficiency of the packaging (envelopes did not fully protecting contents), 46 U.S.C. § 1304(2)(n); and (4) that the vessel exercised due diligence but the loss occurred anyway, 46 U.S.C. § 1304(2)(q).

In light of the fact that defendant offered no evidence tending to show that the steel coils were packaged in an insufficient manner, the Court dismisses this argument

as meritless. The Court does find, however, that the excessive sweating coupled with the defendant's inability to properly ventilate qualifies as an excepted cause and relieves defendant of liability.

11. For sweating to qualify as an excepted peril, a carrier "has to absolve itself from negligence by showing that despite prompt, timely, prudent and adequate steps in ventilation and protective measures, the sweating nonetheless occurred from inescapeable conditions of ocean carriage." *Mondial United Corp.*, 316 F.2d at 169. But, a carrier is liable if it fails to provide, without excuse, proper ventilation, " 'or if its improper stowage contributes to the sweat.' " *Id.* (citation omitted). Here, it is clear that rough sea conditions during the voyage from Finland to Florida prevented the Captain from providing sufficient ventilation. T.T. at 163. In fact, had he attempted to allow for ventilation, it is highly likely that seawater rust would have occurred. *Id.* Therefore, the Court concludes that the Captain's failure to ventilate was excusable.

Whether it was proper for the cold-rolled steel taken aboard in Helsinki to be stowed in the same hold with the snow-covered hot-rolled steel loaded in Raahe was a point of disagreement among the experts who testified at trial. The Court notes initially that the steel coils were not stowed in such a way that they were in physical contact with the wet cargo. As Captain Buck, plaintiff's surveyor stated, the steel coils were separated from the steel plates by 4' × 4' boards which served as dunnage. This prevented direct contact. T.T. at 209–10; Plaintiff's Exhibit 5. Accordingly, it is clear that it was not the physical contact of the water from the steel plates that caused freshwater rust on the steel coils.

12. Plaintiff contends that by loading wet cargo, or cargo with snow and ice on it, defendant introduced moisture into the cargo hold which then aggravated the moisture content of the air to such an extent as to cause "excessive" sweating. Testimony of the surveyors did not indicate that excessive moisture existed in the hold in Jacksonville. Captain Martin, when asked about the stowage of the dry cargo with the wet cargo, stated that under the conditions of this voyage, the sweat normally expected would have been sufficient by itself to make the cargo wet at some point during the voyage. T.T. at 258–59. There is, therefore, no basis for this Court to determine that the stowage of the wet cargo was a contributing factor or that, "but for" the stowage of the wet cargo, this rust would not have occurred.

13. Neither the vessel nor the crew can be faulted. Each of the surveyors who testified on the issue commented that the vessel was in excellent condition and was adequately equipped and crewed. T.T. at 70, 160, 168, 200. Plaintiff has not alleged otherwise.

14. Based on the Court's findings of fact and its analysis of applicable law, the Court is of the opinion that defendant has proved that the damage resulted from an excepted cause as set forth in 46 U.S.C. § 1304. That is, sweat caused by shipping steel from an extremely cold climate to a warm climate, combined with the inability of the carrier to ventilate, most likely caused the rust herein at issue.

15. The Court's findings and conclusions stated above absolve defendant of any liability for freshwater rust to steel coils transported form Finland to Jacksonville, Florida, and Houston, Texas. Plaintiff is entitled, however, to recover for the short delivery of steel plates intended for Houston and carried under bills of lading 63H and 64H ($5,337.87), and bills of lading 66H, 68H, and 69H ($2,407.32). *See* Plaintiff's Exhibits 10A and 11A.[2]

In accordance with the above Findings of Fact and Conclusions of Law, it is

ADJUDGED:

That the Clerk of the Court is directed to enter judgment for plaintiff in the amount of $7,745.19 with costs to be assessed according to law.

ORDER

This cause is before the Court on plaintiff's Motion for New Trial and for Additional Findings of Fact and Conclusions of Law, filed herein on August 31, 1987. Defendant filed a response thereto on September 8, 1987. The Court has reviewed plaintiff's motion, defendant's response, the record herein, and the Findings of Fact and Conclusions of Law entered on August 18, 1987. Based on that review, it is

ORDERED AND ADJUDGED:

1. That plaintiff's Motion for New Trial and for Additional Findings of Fact and

2. The claims for damages by plaintiff with regard to the the cargo carried under these bills of lading include physical damage as well as non-

delivery. Defendant in its Proposed Findings of Fact and Conclusions of Law admits liability as to these claims.

Conclusions of Law is hereby granted in part and denied in part;

2. That the Clerk is hereby ordered to amend the judgment entered on August 18, 1987, to read that "judgment is hereby entered in favor of the plaintiff in the amount of $7,745.19, plus $3,325.54 in prejudgment interest, with costs to be assessed according to law"[3]; and

3. That in all other respects plaintiff's Motion for New Trial and for Additional Findings of Fact and Conclusions of Law is hereby denied.

Marty Steinberg, Holland & Knight, Miami, Fla., for defendant.

## MEMORANDUM ORDER

SCOTT, District Judge.

---

3. Court assessed prejudgment interest from January 19, 1984, to August 18, 1987, at a rate of 12% per annum.