**ASSOCIATED METALS AND MINERALS CORP.,**
Plaintiff–Appellant,

v.

**ETELAE SUOMIN LAIVA,**
Defendant–Appellee.

No. 87–3775.

United States Court of Appeals,
Eleventh Circuit.

Oct. 25, 1988.

Randal D. Pratt, New York City, Edward F. Gerace, Tampa, Fla., for plaintiff-appellant.

Robert E. Warren, Jacksonville, Fla., for defendant-appellee.

Before TJOFLAT, VANCE and COX, Circuit Judges.

PER CURIAM:

Appellant Associated Metals and Minerals Corporation ("Associated") filed suit in admiralty against Etelae Suomin Laiva ("Etelae") for rust damage to and partial nondelivery of a cargo of steel carried aboard Etelae's ship, the M/V Arkadia, from Helsinki and Raahe, Finland, to Jacksonville, Florida, and Houston, Texas. The district court, after trial, concluded that while plaintiff had met its burden of proving that the cargo was delivered to the carrier in good condition, plaintiff had failed to establish that the cargo was damaged upon discharge, which failure was fatal to plaintiff's *prima facie* case under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1300 *et seq.* (1975).[1] 671 F.Supp. 743. The district court then concluded that Etelae would have prevailed even had Associated established a *prima facie* case since Etelae had proved that two of the excepted causes under COGSA were responsible for the damage: inherent vice, and perils of the sea.[2] Having reviewed

---

**1.** 46 U.S.C.App. § 1303(6) provides, in pertinent part:

Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

A *prima facie* case consists of a showing by the plaintiff "that cargo was loaded in undam-

aged condition, and discharged in [damaged] condition...." *Socony Mobil Oil Co. v. Texas Coastal and International, Inc.,* 559 F.2d 1008, 1010 (5th Cir.1977). Etelae does not challenge the district court's finding that the cargo at issue was delivered to it in good condition, and we do not review that finding.

**2.** 46 U.S.C.App. § 1304(2) provides, in pertinent part:

Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(c) Perils, dangers, and accidents of the sea or other navigable waters;

....

the district court's findings of fact for clear error,[3] and its application of the law plenarily, we affirm.

## I. *Facts.*

Associated was the consignee of a cargo of steel which was shipped from Raahe and Helsinki, Finland, to Jacksonville, Florida, and Houston, Texas, aboard the M/V Arkadia, a vessel owned by Etelae. Calling at Raahe from December 9–17, 1983, the Arkadia was loaded with hot-rolled steel coils, and steel plates and pipes. Temperatures during that time ranged from − 22 degrees Centigrade to + 2 degrees Centigrade, and the hot-rolled coils and steel plates, when loaded, were covered with snow and ice.[4] From December 19–23, 1983, the Arkadia called at Helsinki, where temperatures ranged from − 2 degrees Centigrade to + 3 degrees Centigrade. There, the Arkadia was loaded with coils of cold-rolled and galvanized steel which were placed atop the snow-and ice-covered plates which had been loaded in Raahe.[5] All of the cargo was in good order and condition upon loading.

During the voyage across the Atlantic to Florida, the Arkadia encountered high winds and heavy seas, with waves breaking frequently over the decks.[6] For this reason, the crew of the vessel was unable to ventilate the cargo during the voyage. As the Arkadia steamed southward, the ambient air increased in temperature relative to the temperature of the steel.[7] The drastic changes in temperature caused the steel to "sweat" which, in turn, caused rust to form on some of the cold-rolled coils and galvanized steel.[8]

The Arkadia arrived in Jacksonville on January 11, 1984. Cargo destined for Jacksonville, consisting of steel plates and ninety-seven coils of cold-rolled steel, was discharged from holds two and five. The discharge operation, which was hampered intermittently by inclement weather, was attended by three marine cargo surveyors. All of the hatches and their appurtenances were found to be in excellent operating condition, and there was no evidence that any of the cargo had shifted during transit. Condensation was noted, however, in hold number two, which was carrying the nine-

(p) Latent defects not discoverable by due diligence;
....

The district court correctly placed upon Etelae the burden of proving the applicability of one of the statutory exceptions to COGSA liability. *See Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225, 1227 (11th Cir.1983).

3. A finding of fact is not clearly erroneous unless the reviewing court is left with a "definite and firm conviction that a mistake has been committed." *In re Beverly Manufacturing Corp.,* 841 F.2d 365, 368 (11th Cir.1988) (citations omitted). As the Supreme Court has stated: "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though it is convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer, N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed. 2d 518 (1985) (citations omitted).

4. The bills of lading pertaining to the snow-and ice-covered steel were claused to indicate that condition.

5. The expert testimony at trial establishes that only cold-rolled and galvanized steel are subject

to substantial deterioration from the effects of freshwater rust, and all of the rust-damage claims in this case pertain to the cold-rolled coils and galvanized steel.

6. Associated argues that "[t]here was no evidence submitted by Etelae at trial to prove what weather was encountered during the voyage," and that "Etelae failed to produce a single ship's officer or the vessel's log to prove" the weather conditions. Brief of Appellant at 16–17. On the contrary, testimony and documentation offered by two marine surveyors as to information they gathered from the Arkadia's log confirms the district court's finding that the Arkadia encountered severe weather during most of the voyage. Associated interposed no objection at trial as to the evidence's admissibility, and does not argue on appeal that admission of the evidence was plain error.

7. By the time the Arkadia reached Houston, it had progressed through temperatures ranging from well below freezing in Finland to + 80 degrees Fahrenheit as it rounded the Florida peninsula.

8. "Sweating" is a term of art in the maritime cargo industry which refers to the formation of condensation on cargo surfaces.

ty-seven coils of cold-rolled steel, and upon the surfaces of the cargo stowed in that hold. Moreover, light to moderate rust was noted on the cans containing the cold-rolled coils; however, there was nothing to suggest that the coils themselves had been affected by rust. Upon discharge, the coils were stored in an open-ended, covered warehouse adjacent to the wharf. Because the coils had been roughly handled by stevedores, a survey of the coils in the warehouse indicated that a number of the canisters had been moderately to severely damaged, and their protective integrity thereby weakened.

Between January 24 and February 17, 1984, substantially all of the coils were moved from Jacksonville to a warehouse in Norcross, Georgia, belonging to the National Steel Service Center.[9] A survey was conducted on coils in Norcross in late February,[10] and all of the coils surveyed were found to have been affected by freshwater rust. The surveyor expressed no opinion at trial, however, as to when the coils had been exposed to freshwater, and the trial court found that the evidence did not establish when the exposure to freshwater had occurred. This finding is not clearly erroneous. Because of the rust damage, the total depreciation in value of the coils was $62,193.73.

The Arkadia arrived in Houston on January 19, 1984, and the discharge of cargo bound for Houston, including cold-rolled coils and galvanized steel, was completed on January 27—again, with intermittent interruptions due to inclement weather. Two marine cargo surveyors attended the discharge of cargo, one of whom noted that water was running out of the cold-rolled coils as they were being unloaded. As in Jacksonville, light to moderate rust was noted on the coil canisters, but the rust did not suggest to the surveyors that the coils

themselves were rusty. The coils were loaded directly upon trucks and transported to a nearby warehouse which was completely enclosed and heated. Approximately six months later, the coils were surveyed in that warehouse.[11] Substantial rust was observed on many of the coils and on much of the galvanized steel. The surveyor attributed the rust to sweating which occurred during ocean transit. The affected coils, which depreciated in value by $34,-689.64, were sold for salvage. No notice of this damage was given until after the survey.

## II. *Discussion.*

■ To establish a *prima facie* case of entitlement to recovery under COGSA, a plaintiff must establish that cargo was delivered to the carrier in good condition and discharged at its destination in damaged condition. *Socony Mobil Oil Co. v. Texas Coastal & International,* 559 F.2d 1008, 1010 (5th Cir.1977). The district court found that all of the cargo at issue in this case was delivered to the Arkadia in good order and condition, and this finding is not contested on appeal. The district court also concluded that Associated failed to establish that any of the cargo was damaged at discharge, and that, therefore, Associated failed to establish a *prima facie* case under COGSA.

Under 46 U.S.C.App. § 1303(6), failure to give the carrier notice of damage to cargo within three days of delivery is "prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading."[12] However, "[w]hen sufficient evidence indicating that the cargo was damaged prior to discharge is introduced, the prima facie evidence under § 1303(6) is accorded no special weight beyond that given other evidence concerning where the dam-

---

**9.** At least three of the coils were not removed from Jacksonville until March and April, 1984.

**10.** The evidence does not conclusively establish whether the coils surveyed were, in fact, the coils which were shipped aboard the Arkadia. This gap in the evidence, however, is inconsequential.

**11.** It is not unusual for surveys on cold-rolled steel coils to be conducted some time after discharge because the practice in the industry is to leave the coils in their containers until they are sold in whole or in part.

**12.** It is undisputed that timely notice of damage was not given as to either the Jacksonville or the Houston shipments.

age occurred." *Harbert International Establishment v. Power Shipping*, 635 F.2d 370, 373 (5th Cir. Unit B 1981). Stated otherwise: "once the plaintiffs come forward with sufficient evidence to suggest that the cargo was contaminated before discharge a fact issue is created, which the Court must resolve." *Socony Mobil Oil Company*, 559 F.2d at 1012.

■ The district court's finding that Associated failed to offer evidence as to when the coils discharged in Jacksonville were damaged is correct. The surveyor upon whom Associated relies reported freshwater rust damage to the ninety-seven cold-rolled coils, but expressed no opinion as to when the coils were exposed to freshwater. The record demonstrates plausibly that the exposure could have occurred after discharge, and Associated offered no evidence to rebut this inference. Accordingly, the district court correctly concluded that Associated did not establish a *prima facie* case as to the Jacksonville cargo. *Cf. Associated Metals v. M/V Rupert de Larrinaga*, 581 F.2d 100 (5th Cir.1978) (plaintiff failed to rebut *prima facie* evidence because surveyor offered no opinion as to whether damage occurred during ocean transit).

■ The district court's conclusion that Associated had failed to establish a *prima facie* case as to the Houston shipment is incorrect. The court noted the surveyor's opinion that the rust damage occurred because of sweating which occurred during ocean transit, and did not explicitly reject this testimony or note testimony to the contrary; yet, in its conclusions of law, the district court apparently ignored this state of the record. Indeed, the *only* evidence presented on this issue was that the Houston cargo suffered from rust damage, and that the damage occurred during ocean transit. Although the district court made no specific finding as to when the damage occurred, a finding that it did not occur during ocean transit is implicit in its conclusion that Associated failed to establish a *prima facie* case as to the Houston shipment. That finding, though only implicit, is clearly erroneous.

■ Our decision that the district court incorrectly concluded that Associated did not establish a *prima facie* case as to the Houston shipment does not, however, warrant reversal. The district court's finding that the rust damage resulted from a peril of the sea within the meaning of 46 U.S.C. App. § 1304(2)(c) is not clearly erroneous. It is well established that "sweating" is a peril of the sea, and that the carrier bears the burden of proving that sweating was unavoidable despite all reasonable efforts to avoid it by ventilation or otherwise. *Compagnie De Navigation v. Mondial United Corp.*, 316 F.2d 163, 169 (5th Cir. 1963). All experts who expressed an opinion in this case testified that the only way to prevent sweating when transporting steel from a cold to a warmer climate is through ventilation. They also agreed, however, and the district court found, that ventilation was impossible under the circumstances, and that, indeed, ventilation might have exacerbated the problem by precipitating saltwater rust damage. There is no evidence, on the other hand, to suggest that the decision not to ventilate was negligent. *Accord Daido Line v. Thomas P. Gonzalez Corp.*, 299 F.2d 669, 674 (9th Cir.1962). Moreover, Associated offered no evidence that a nonexcepted cause under COGSA operated concurrently with sweating to cause the rust damage. Therefore, Etelae is absolved from liability because it proved that the rust damage of which Associated complains resulted from an excepted cause under 46 U.S.C.App. § 1304(2), namely, a peril of the sea.

III. *Conclusion.*

For these reasons, the judgment of the district court is AFFIRMED.