### COMPAÑIA SUD AMERICANA DE VAPORES, S.A., Plaintiff,

v.

### I.T.O. CORP. OF BALTIMORE, et al., Defendants.

Civil Action No. S–95–1838.

United States District Court, D. Maryland.

Sept. 18, 1996.

Opinion Denying Reconsideration October 7, 1996.

---

Manfred W. Leckszas, Warren B. Daly, Jr., George H. Falter, III, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for Plaintiff.

JoAnne Zawitoski, Semmes, Bowen & Semmes, Baltimore, MD, for I.T.O. Corp. of Baltimore.

Thomas S. Basham, Bergen & Tripoda, Timonium, MD, for Coastwide & Atlantic.

## MEMORANDUM OPINION AND ORDER

SMALKIN, District Judge.

The parties to this indemnity action in admiralty are plaintiff Compañia Sud Americana De Vapores, S.A., (CSAV), and defendants I.T.O. Corporation of Baltimore (I.T.O.), Coastwide Cargo Securing Co., Inc., (Coastwide) and Atlantic Marine Contractors, Inc. (Atlantic Marine). The action is before the Court on the cross-motions of CSAV and I.T.O. for summary judgment. CSAV seeks summary judgment against I.T.O., or, "[i]n the alternative," against I.T.O. and Coastwide jointly and severally.

(CSAV's Mot.Summ.J. at 3). I.T.O. seeks summary judgment against CSAV. The summary judgment motions have been fully briefed and no oral hearing is necessary.[1] Local Rule 105.6 (D.Md.).

### Factual and Procedural Background

The parties have stipulated to the following facts. CSAV, a Chilean ocean carrier, entered into a Stevedore and Marine Services Agreement with I.T.O., a stevedoring company, whereby I.T.O. would provide stevedoring and other terminal services to all CSAV vessels calling at the Port of Baltimore. Pursuant to this agreement, I.T.O. took delivery of a Lorain crane at the South Locust Point Marine Terminal in Baltimore on November 13, 1992. I.T.O. was to store the crane briefly and then load it onto the M/V LIMARI, a CSAV vessel, for transportation to Valparaiso, Chile.

In early December, 1992, employees of the defendant Coastwide lashed the crane onto a flatrack for transportation to the M/V LIMARI. The Coastwide employees performed their services "at CSAV's request." (Stipulation of Facts at 3.) I.T.O. employees loaded the flatrack on an unpowered wheeled chassis known as a mafi. While an I.T.O. yard hustler operator was taking the crane to the ship, the flatrack slipped from the mafi and fell to the pier. The crane was damaged and was never loaded aboard the M/V LIMARI.

The purchaser of the crane, Astilleros y Maestranzas de la Armada (ASMAR), had insured the cargo through a Chilean insurance company. The cargo underwriters paid $90,444.34 as compensation for the damage to the crane.[2] Thereafter, the cargo underwriters presented a claim in writing to CSAV's general agent in New York, demanding the full amount of their payment.

For its part, CSAV had formally notified I.T.O. in early December, 1992, that it intended to hold I.T.O. fully responsible for the damage to the crane. In October, 1993, CSAV told I.T.O. that the cargo underwriters had made a claim against CSAV. In December of that year, CSAV's New York general agent wrote to I.T.O., explaining that CSAV felt itself to be in imminent danger of suit in Chile and that it wished to settle the underwriters' claim. I.T.O. responded that it disagreed with CSAV's proposed course of action because, in I.T.O.'s view, any suit by the underwriters would be time-barred. As an alternative to the proposed settlement, I.T.O. suggested that CSAV and I.T.O. should join together to file a preemptive declaratory judgment action in the United States, seeking a declaration that the underwriters' claim was barred by both contractual and statutory limitations provisions. A few days after I.T.O. had made its proposal, CSAV informed I.T.O. that the cargo underwriters had made a final settlement proposal of $65,000 and had threatened to sue CSAV immediately in Chile if CSAV did not accept their proposal by early February. CSAV told I.T.O. that it intended to settle with the cargo underwriters and that it would not join I.T.O. in any proposed declaratory judgment action in the United States. Accordingly, CSAV settled the claim in Chile for $65,000 in early February, 1994, before any suit had been filed. In the present action, CSAV seeks indemnification from I.T.O. I.T.O. denies liability, arguing, *inter alia*, that CSAV's decision to settle with the underwriters was unreasonable as a matter of law.

The principal issue dividing the parties with respect to the prudence of CSAV's settlement involves choice of law. According to I.T.O., the one-year limitations period provided by § 1303(6) of the Carriage of Goods by

---

1. Although the defendants have filed various cross-claims against one another, no issue relating to that aspect of the litigation is currently before this Court for decision.

2. Although the parties do not so stipulate, it appears that the cargo underwriters did not reimburse their named insured directly. Instead, they paid the shipper of the crane to provide a replacement crane to the insured. I.T.O. contends that this method of structuring the reimbursement deprived the insurers of standing to sue CSAV because it meant that the named insured "suffered no actual loss and received nothing from the cargo underwriters." (I.T.O. Opp. at 9.) I.T.O.'s formalistic argument is unpersuasive. It is clear from the undisputed facts that the cargo underwriters acquired a valid subrogated interest when they paid ASMAR's claim, regardless of the manner in which they chose to make that payment.

Sea Act (COGSA) applies to any action against I.T.O. to recover damages for the injury to the crane. CSAV's bill of lading for the crane includes a clause paramount which provides, *inter alia,* that

> [f]or shipments to or from the United States ... this Bill of Lading shall be deemed to incorporate and shall have effect subject to the provisions of the United States Carriage of Goods Act.... The provisions stated in said acts shall ... govern before the Goods are loaded on and after they are discharged from the ship and throughout the entire time that they are in the custody of the Carrier at a United States ... Port.

(Bill of Lading, Clause 2, Exh. C to I.T.O.'s Mot.Summ.J.). The bill of lading also includes a Himalaya Clause, which entitles "stevedores, longshoremen, terminal operators and others used by the Carrier in the performance of its work" to "all defenses, exemptions and immunities from and limitations of liability which the carrier has under the provisions of this Bill of Lading and under the United States Carriage of Goods by Sea Act." (*Id.,* Clause 6.) Consequently, I.T.O. argues, COGSA is a part of the contractual relationship between the parties and governs I.T.O.'s potential liability for damage to the crane.[3]

I.T.O. specifically seeks to invoke § 1303(6) of COGSA, which provides that "the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered." Because no suit had been brought within the relevant one year period, I.T.O. contends that neither CSAV nor I.T.O. had any further exposure to liability for damage to the crane. As a consequence, in I.T.O.'s view, CSAV's decision to settle with the cargo underwriters in February, 1994 was unreasonable as a matter of law.

CSAV, of course, takes an entirely different view of the case. CSAV recognizes that COGSA is incorporated into the contract set forth in the bill of lading and has stipulated that "if cargo underwriters had brought their subrogation claim for damage to the Lorain crane in a United States court, CSAV, ITO [sic] and Coastwide all would have been entitled to the benefit of all applicable defenses under COGSA." (Stipulation of Facts at 4.) CSAV contends, however, that the parties' agreement with respect to COGSA is immaterial because cargo underwriters did not file suit in the United States but, rather, threatened to sue CSAV in Chile. The parties have stipulated that Chile has adopted "an international convention known as the Hamburg Rules ... as its law governing the carriage of goods by sea." (Stipulation of Facts at 3.) The Hamburg Rules, unlike COGSA, provide a two-year period of limitations. (*Id.,* art. 20, § 1.)[4]

---

**3.** The bill of lading also contains a separate clause which provides for a one-year limitations period. (Bill of Lading, Clause 17, Exh. C to I.T.O.'s Mot.Summ.J.). The language of Clause 17 is borrowed from the limitations provision of COGSA, 46 U.S.C. § 1303(6). Because this clause has the same legal effect as the contractual provisions incorporating COGSA by reference, it does not warrant separate treatment in this opinion.

**4.** The Hamburg Rules provide not only a different limitations period from COGSA, but also different limitations on liability. *Compare* 46 U.S.C. § 1304(5) (limiting liability to $500 per package or per customary freight unit) *with* Hamburg Rules, art. 6, § 1(a) (limiting liability to 835 units of account per package or 2.5 units per kilogram of gross weight of the goods, whichever is the higher).

The parties have stipulated that at the time of CSAV's settlement with cargo underwriters the applicable exchange rate was US$1.38 per unit of account. At that rate of exchange, a carrier's liability for a 22,662 kilogram crane would be limited under the Hamburg Rules to approximately $78,000. (The product of 22,662, 2.5 and 1.38 is 78,183.90.) By contrast, a crane might be treated as a "customary freight unit" under COGSA, resulting in a limitation of liability of $500. *See, e.g., Caterpillar Overseas, S.A. v. Marine Transport, Inc.,* 900 F.2d 714, 722–725 (4th Cir.1990) (applying $500 liability limitation to unit consisting of a tractor); *Aetna Ins. Co. V. M/V LASH ITALIA,* 858 F.2d 190, 193 (4th Cir. 1988) (military vehicles constituted a customary freight unit where carrier calculated freight on a 'per vehicle' basis); *Barth v. Atlantic Container Line,* 597 F.Supp. 1254, 1256 (D.Md.1984) ("The cars themselves are the customary freight unit, and the limitation therefore applies per car ..."). The difference between the Hamburg Rules and COGSA with respect to limitations of liability may explain the cargo underwriters' decision to pursue the claim against CSAV in Chile, rather than in the United States.

CSAV argues that the Hamburg Rules, rather than COGSA, would supply the limitations period for any litigation filed in a Chilean court to recover damages for the injury to the Lorain crane. If applicable, the Hamburg Rules would render the COGSA provisions incorporated into the parties' bill of lading, including the one-year period of limitations, "null and void." Hamburg Rules, art. 23 § 1. CSAV therefore argues that it acted reasonably when it settled the underwriter's claim in Chile, where it had been threatened with suit, even though the limitations period provided by COGSA had expired.

I.T.O.'s sole argument in its motion for summary judgment was that CSAV's settlement of a time-barred claim was a gratuitous payment which was unreasonable as a matter of law. Responding to CSAV's summary judgment motion, however, I.T.O. asserts that CSAV has failed to establish any right to indemnification for a number of additional reasons. According to I.T.O., CSAV failed to tender the defense of the underwriters' claim to I.T.O., failed to establish that an indemnitor/indemnitee relationship existed between itself and I.T.O., failed to demonstrate that it was required to pay the underwriters for the damage to the crane, failed to show that its settlement with cargo underwriters was reasonable and failed to establish that I.T.O. was legally or factually responsible for the damage to the crane.

### Summary Judgment Standards

Summary judgment may be entered in a civil case if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding cross-motions for summary judgment, this Court must, with regard to each motion, consider the facts and draw its inferences in the light most favorable to the party opposing the motion. *See Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993). Because the parties have entered into a stipulation of facts which describes most of the events underlying the action, this case may be an appropriate one for disposition through summary judgment.

### Choice of Law

I.T.O.'s argument that suits for damage to the crane should have been filed within the COGSA limitations period, rather than within the period provided by the Hamburg Rules, has both a substantive and a procedural aspect. At the procedural level, I.T.O. contends that CSAV's motion for summary judgment should be denied because of CSAV's "woefully inadequate presentation of Chilean law." (I.T.O.'s Opp. at 39.) First, I.T.O. complains that CSAV "has failed to establish ... whether the Hamburg Rules were enacted into Chilean law *verbatim*, or whether they were enacted with certain changes in text to take into account local Chilean law or custom." (I.T.O.'s Opp. at 23.) I.T.O. also complains that CSAV has offered "its own interpretation of the meaning of various provisions of the Hamburg Rules, without any citation to Chilean legal precedent." (*Id.* at 24.) Lastly, I.T.O. contends that because CSAV has not explained Chile's choice of law rules, CSAV has failed to establish that a Chilean court would apply the Hamburg Rules, rather than COGSA, to a suit to recover damages for an injury sustained in the United States. (*Ibid.*)

Contrary to I.T.O.'s assertions, CSAV has provided this Court with an adequate basis for resolving the issues relating to Chilean law. I.T.O. itself has stipulated that "[o]n November 1, 1992, an international convention known as the 'Hamburg Rules' came into force in Chile as its law governing the carriage of goods by sea." (Stipulation of Facts at 3.) In light of this stipulation, I.T.O. cannot now contend that CSAV has failed to prove that the Hamburg Rules were adopted *verbatim* by Chile. I.T.O.'s acquiescence in the stipulation made such proof by CSAV unnecessary.

■ I.T.O.'s complaints about CSAV's failure to cite to Chilean authority likewise lack merit. Rule 44.1 of the Federal Rules of Civil Procedure provides, in part, as follows:

The court, in determining foreign law, may consider any relevant material or source ... whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

The Advisory Committee Notes to Rule 44.1 explain that in determining foreign law "the court is not limited by material presented by the parties ... [It] may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail." Consequently, unless a court insists upon a complete presentation of foreign law by the parties, a litigant's failure to answer all of the questions raised under foreign law is not fatal to his or her case. The court may, though it need not, undertake its own research to supplement counsel's submissions on foreign law. Because this Court did indeed conduct its own research into the law of Chile, CSAV's motion for summary judgment will not be denied on the basis of any alleged deficiencies in its presentation of Chilean law.[5]

■ On the merits of the choice of law issue, I.T.O. argues that because the contractual relationship between itself and CSAV included the COGSA one-year limitations period, CSAV "made a wholly voluntary payment to cargo interests after cargo interests were precluded from bringing an action against CSAV by virtue of the one-year time bar provision in COGSA." (I.T.O.'s Mot. Summ.J. at 4.) I.T.O. first argues that "the provisions of COGSA automatically governed the contract for the shipment of the Lorain crane from Baltimore to Chile" because "COGSA, by its terms, governs every contract for the carriage of goods by sea in foreign trade to or from ports of the United States." (I.T.O.'s Mem.Mot.Summ. J. at 6.) As I.T.O. itself acknowledges, however, "COGSA, by its own terms, covers only the period from the time the goods are loaded on board until the time they are discharged from the vessel." (*Ibid.*) *Accord* 46 U.S.C. § 1301(e) (contract of carriage "covers the period from the time when the goods are

loaded on to the time when they are discharged"); *Associated Metals & Minerals Corp. v. Etelae Suomin Laiva,* 671 F.Supp. 743, 748 (M.D.Fla.1987), *aff'd,* 858 F.2d 674 (11th Cir.1988). It is undisputed in the present case that the crane was damaged on the dock before loading. The provisions of COGSA therefore apply in the present case, if they apply at all, not by operation of law but through their incorporation into the contractual relationship between the parties.

Clause 2 of CSAV's bill of lading provides that "this Bill of Lading shall be deemed to incorporate and shall have effect subject to the provisions of the United States Carriage of Goods Act." Similar contractual provisions have been held to make COGSA's provisions applicable, by agreement, to situations which the Act would not govern with the force of law. *See, e.g., Complaint of Damodar Bulk Carriers, Ltd.,* 903 F.2d 675, 681 (9th Cir.1990) ("Although COGSA does not apply *ex proprio vigore,* the bill of lading provides adequate grounds for applying the statute as a contractual term"); *Colgate Palmolive Co. V. S/S DART CANADA,* 724 F.2d 313, 315 (2d Cir.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984) ("Parties may contractually extend COGSA's application beyond its normal parameters. When they do so, however, COGSA does not apply of its own force, but merely as a contractual term."). The choice of law issue presented here does not, therefore, involve a direct conflict between the law of the United States and the law of Chile. Rather, the question is whether a Chilean court would apply the limitations period supplied by the Hamburg Rules or whether it would defer to the parties' contractual choice of a different limitations period.

I.T.O. has argued that this Court cannot resolve the choice of law question without an understanding of general Chilean choice of law principles. I.T.O.'s argument is ill-founded. Regardless of Chile's usual approach to choice of law questions, all actions involving the carriage of goods by sea are governed by the Hamburg Rules, which provide in Article 2, § 1 as follows:

**5.** This Court received particular assistance from the Law Library of the Library of Congress.

The provisions of this Convention are applicable to all contracts of carriage by sea between two different States, if ... (b) the port of discharge as provided for in the contract of carriage by sea is located in a Contracting State....

Section 2 of Article 2 further provides that "[t]he provisions of this Convention are applicable without regard to the nationality of the ship, the carrier, the actual carrier, the shipper, the consignee or any other interested person." The Hamburg Rules therefore apply with the force of law in Chile to the contract for the carriage of the Lorain crane because the contract provided that the crane would be discharged in a Chilean port.

Article 23 of the Hamburg Rules states that "[a]ny stipulation in a contract of carriage by sea, in a bill of lading, or in any other document evidencing the contract of carriage by sea is null and void to the extent that it derogates, directly or indirectly, from the provisions of this Convention." Hamburg Rules, art. 23, § 1. Although "a carrier may increase his responsibilities and obligations under this Convention" by contract, the carrier cannot contractually reduce those obligations. On the contrary, every bill of lading subject to the Hamburg Rules must expressly state that it is "subject to the provisions of this Convention which nullify any stipulation derogating therefrom to the detriment of the shipper or the consignee." Hamburg Rules, art. 23, §§ 2 and 3.

I.T.O. argues that this Court should not conclude that Article 23 invalidates the contractual provisions that incorporate COGSA into the contract of carriage for the Lorain crane. According to I.T.O., without "a single Chilean case or other Chilean authority delineating ... what is meant by the terms 'stipulation' or 'derogates,'" it is unclear whether a Chilean court would hold CSAV's Clause Paramount invalid under the Hamburg Rules. (I.T.O.'s Opp. at 24–25.)

I.T.O. takes too narrow a view of the resources available to this Court in interpreting the Hamburg Rules. The Rules themselves state that "[i]n the interpretation and application of this Convention regard shall be had to its international character and to the need to promote uniformity." Hamburg Rules, art. 3. Rules that are to be applied uniformly by a number of signatory countries must be given their plain meaning where that meaning is readily discernible. Under the circumstances of the present case, there is no reason to suppose that a Chilean court would not give the words "stipulation" and "derogates" their ordinary legal meanings.[6] The issue presented here is a straightforward application of Article 23, § 1, which renders unenforceable contractual agreements that are inconsistent with the Rules. No abstruse or difficult question of interpretation is involved. The contractual provision in dispute provides for a limitations period that is not only different from the Hamburg Rules period, but is also more favorable to the carrier. Under any plausible reading of Article 23 of the Hamburg Rules, therefore, the contractual clauses providing for the COGSA one-year period of limitations are stipulations in derogation of those Rules and are therefore unenforceable.

This Court accordingly holds, as a matter of law, that a Chilean court would have applied the Hamburg Rules in any litigation brought by the cargo underwriters in Chile against CSAV. Furthermore, the Court holds that the Chilean court would have applied Article 23 of the Hamburg Rules to invalidate the provisions of the bill of lading that incorporates COGSA, or that otherwise provide for a one-year period of limitations for suits against the carrier.

### Other Indemnity Issues

In light of the Court's holding with respect to choice of law, I.T.O. cannot prevail on its theory that CSAV has no right to indemnity

---

**6.** A "stipulation" is a "material condition, requirement, or article in an agreement." Black's Law Dictionary (5th Ed.1979). "Derogation" is "the partial abrogation or repeal of a law, contract, treaty right, etc." Oxford English Dictionary (1971). Obviously, different signatory countries will adopt the Hamburg Rules into law in different languages, so that a Chilean court would not be concerned with exactly these words. Despite their translation into different languages, however, the Hamburg Rules are intended to have substantially the same meaning wherever they have been adopted. *See* Hamburg Rules, art. 3.

because its settlement with the underwriters was merely the gratuitous payment of a stale claim. I.T.O., however, has put forward numerous additional reasons why CSAV's action for indemnity should fail.

■ The parties agree that the elements of the cause of action for indemnity asserted by CSAV are those described by the Court of Appeals for the Fourth Circuit in *Vaughn v. Farrell Lines, Inc.*, 937 F.2d 953 (4th Cir. 1991), as follows:

> First, the party seeking indemnity must initially show that an indemnitor-indemnitee relationship between itself and the proposed indemnitor.... Second, the indemnitee must demonstrate that it was under some compulsion to satisfy the claims of the original plaintiff.... Third, the indemnitee must prove that its settlement with the plaintiff in the underlying action was reasonable.... Finally, the indemnitee must show that the unlawful action of the indemnitor proximately caused the injury to the original plaintiff.

*Vaughn*, 937 F.2d at 956–957.[7] The parties to the present case addressed the elements of the cause of action *seriatim*. This Court, instead, will consider first the grounds upon which I.T.O. might be legally responsible for damage to the crane and the extent to which such responsibility would give rise to an indemnitor-indemnitee relationship between I.T.O. and CSAV (the first and fourth *Vaughn* elements); next, the question of CSAV's compulsion to satisfy the underwriters' claims (the second *Vaughn* element); and finally whether CSAV's settlement with cargo underwriters was reasonable (the third *Vaughn* element).

### A. *Theories of Liability and Indemnification.*

■ CSAV has alleged two causes of action against I.T.O. for the damage to the crane, and has put forward a corresponding theory of indemnification for each. According to CSAV, I.T.O. negligently damaged the crane, and must indemnify CSAV because it was the primary, or active, tortfeasor. CSAV also seeks to hold I.T.O. liable under a contract theory, arguing that I.T.O. breached its warranty of workmanlike service. A stevedore who breaches that warranty must indemnify a shipowner held responsible for damage resulting from the breach.

### I. *Direct Negligence—res ipsa loquitur.*

CSAV alleges that I.T.O. is liable in negligence for the damage to the crane. According to CSAV, "[t]his negligence is established through the well-established doctrine of *res ipsa loquitur*." (CSAV's Mem.Mot.Summ. J. at 16.) CSAV contends that I.T.O.'s negligence is established as a matter of law because "a crane does not ordinarily fall from its means of transport in the absence of someone's negligence," because I.T.O. had exclusive control of the crane at the time of the accident and because there is no evidence of contributory negligence. (*Ibid.*) To establish its right to indemnification from I.T.O. for I.T.O.'s alleged negligence, CSAV relies upon the "active/passive" theory of indemnity for tort actions. According to this theory, "shipowners, through their third-party action for indemnity, can ... transfer the ultimate liability to [the primary tortfeasor] on the theory that [the tortfeasor] was guilty of active or primary wrongdoing while they were innocent, or only passively or secondarily liable." *Vaughn*, 937 F.2d at 957.

■ It is probably true that cranes do not ordinarily topple from their flatracks in the absence of negligence. Nevertheless, the doctrine of *res ipsa loquitur* cannot be used to establish I.T.O.'s liability as a matter of law in the present case. The doctrine is not a theory of liability, but an evidentiary device "that permits an inference of negligence to be drawn from a set of proven facts." *Reber v. United States*, 951 F.2d 961, 964 (9th Cir.1991), *cert. denied*, 503 U.S. 987, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992). Specifi-

---

**7.** The Court in *Vaughn,* however, clearly stated that its decision set forth the elements of an indemnity claim "after a settlement when the proposed indemnitor was notified of the underlying claim and tendered the defense, but refused to participate in the settlement." 937 F.2d at 956. One of I.T.O.'s contentions in the present case is that CSAV failed to tender defense of the underwriters' claim to I.T.O. *See* I.T.O.'s Opp. at 15–18. Only the third *Vaughn* element, discussed *infra,* might be affected by an alleged failure to tender defense.

cally, the doctrine permits a plaintiff to prove negligence by means of inferences properly drawn from circumstantial evidence. If there is more than one defendant, then the finder of fact must be able to infer that each defendant either breached a duty to the plaintiff or would be liable to the plaintiff for another's breach of duty. *See, e.g., Ashland v. Ling–Temco–Vought, Inc.*, 711 F.2d 1431, 1438–1440 (9th Cir.1983) (collecting cases); *Creekmore v. United States*, 905 F.2d 1508, 1512 (11th Cir.1990).

In the present case, there is a dispute of fact regarding the actual cause of the damage to the crane. Of particular significance to CSAV's *res ipsa* theory is the parties' disagreement about whether Coastwide or I.T.O. caused the damage. The record evidence is inconclusive. The parties have stipulated that "the Lorain crane was received by I.T.O.," that "Coastwide employees lashed the Lorain crane to the flatrack" and that an I.T.O. yard hustler operator was moving the crane when it fell. (Stipulation of Facts at 2 & 3.) I.T.O. takes the position that "[i]n view of I.T.O.'s lack of exclusive control over Coastwide's lashing operation, the doctrine of *res ipsa loquitur* cannot be used by CSAV to raise a presumption of negligence on the part of I.T.O. in this case." (I.T.O.'s Opp. at 33.) CSAV responds that although both I.T.O. and Coastwide worked on the crane and although the factual cause of the accident is unknown, this Court from can properly infer that I.T.O. was negligent.[8] CSAV's simplest argument in this regard is that "because this accident could not have happened in the absence of negligence of some person and because I.T.O. and Coastwide were the only two entities to handle the crane, they may be required to share the liability for this incident." (CSAV's Mem.Mot.Summ.J. at 17).

■ There is no basis, however, for holding both I.T.O. and Coastwide liable for damage to the crane simply because one or other of them might have been negligent. It is well-established that if two defendants have separately exercised control over the circumstances which gave rise to liability, then *res ipsa loquitur* "would not support a finding of liability against either defendant, even though it might create, in the human mind, a well-grounded conclusion that one or the other was at fault." *Creekmore*, 905 F.2d at 1512. *See also* Restatement (2d) of Torts § 328D, Comment f (the plaintiff must "make the negligence point to the defendant.")

■ CSAV has cited cases which suggest that the joint liability of two or more defendants can be inferred from the mere fact that one or other of them must have been at fault. *See, e.g., Colditz v. Eastern Airlines, Inc.*, 329 F.Supp. 691, 693 (S.D.N.Y.1971) (permitting *res ipsa* inference in a case involving a mid-air collision between two passenger aircraft because the defendant airline companies were "the only parties arguably responsible for the accident herein" and the "plaintiff passengers could in no way have contributed to the accident.") Such a position is, however, inconsistent with the law of this Circuit, which has carefully kept the *res ipsa* inference within its logical boundaries. *See, e.g., Stillman v. Norfolk & Western R.R. Co.*, 811 F.2d 834 (4th Cir.1987); *Estate of Larkins v. Farrell Lines, Inc.*, 806 F.2d 510 (4th Cir.1986), *cert. denied* 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987). As a matter of logic, this Court simply cannot infer the negligence of either I.T.O. or Coastwide from the simple fact that both defendants handled the crane before the accident. The stipulated facts are consistent with any of three hypotheses; that I.T.O. alone was negligent, that Coastwide alone was negligent and that both I.T.O. and Coastwide were negligent. There is no basis for regarding any of these factual scenarios as more or less likely than either of the others. Under Fourth Circuit law, the plaintiff must produce sufficient circumstantial evidence in a *res ipsa* case to support the inference that it is more likely than not that the defendant was negligent. The cases cited by CSAV, which appear to abandon logic in order to shift loss from innocent plaintiffs to defendants who at least *might* have been negli-

---

8. CSAV seeks summary judgment against I.T.O., or, "in the alternative … against ITO and Coastwide, jointly and severally." (CSAV's Mot. Summ.J. ¶ 8.) The primary target of CSAV's motion appears to be I.T.O. CSAV's arguments for multiple defendant liability in tort are generally directed towards establishing I.T.O.'s liability, rather than Coastwide's.

gent, thus cannot be reconciled with Fourth Circuit precedent.

If more than one defendant's negligence can properly be inferred from the established or undisputed facts, however, then *res ipsa loquitur* can be used to prove the negligence of each of them. For example, it may be possible to infer the negligence of two defendants from facts which reveal that they are joint venturers or joint tortfeasors. Likewise, the vicarious liability of an employer-defendant might be inferred from the negligence of an employee. *See generally Ashland*, 711 F.2d at 1439; 1 Stuart M. Speiser, *Res Ipsa Loquitur* § 4:9, at 146 (1972) ("The *res ipsa loquitur* doctrine is applicable to two or more defendants where their relationship is such as to warrant the imputation of the negligence of one of them to the others"); 4 Fowler V. Harper, et al., The Law of Torts § 19.7 (2d ed. 1986). According to CSAV, I.T.O. and Coastwide should be held jointly and severally liable under either of two theories.

CSAV first argues that I.T.O. retained "exclusive control" of the crane for *res ipsa* purposes even though Coastwide lashed the crane to the flatrack. *See* CSAV's Mem.Mot. Summ.J. at 16. As CSAV recognizes, the classic formulation of *res ipsa*, which includes a requirement that "the instrumentality causing the injury was, at the time of the accident, within the exclusive control of the defendant," does not apply in every viable *res ipsa* case. *Estate of Larkins*, 806 F.2d at 513. Because the "exclusive control" element is simply a device for identifying the defendant as the person or entity whose negligence injured the plaintiff, "exclusive control is merely one fact which establishes the responsibility of the defendant; and if it can be established otherwise, exclusive control is not essential to a *res ipsa loquitur* case." Restatement (2d) of Torts, § 328D, comment g. If the commonsense notion of exclusive control does not identify the proper defendant in a particular case, "control" may be more broadly defined "in terms of plaintiff's injury being probably caused by a breach of duty for which defendant is responsible." *Ashland*, 711 F.2d at 1439.

Even under a broader definition of "control," however, neither I.T.O.'s direct negligence nor Coastwide's can be inferred from the stipulated facts in the present case. Even assuming, *arguendo*, that I.T.O. retained some duty to take care of the crane when Coastwide was lashing the crane to the flatrack, CSAV has failed to show that I.T.O. breached that duty. CSAV has not suggested that the relationship between I.T.O. and Coastwide was such that I.T.O. might be liable for any negligence on Coastwide's part.[9] It is not alleged that Coastwide employees were I.T.O.'s employees or agents. On the contrary, the parties have stipulated that Coastwide performed its services "at CSAV's request." (Stipulation of Facts at 3.) Consequently, CSAV has simply failed to produce the necessary "showing of some specific cause for the event which was within the defendant's responsibility, or a showing that the defendant [was] responsible for all reasonably probable causes to which the event can be attributed." Restatement (2d) of Torts, § 328D, comment g.

In the alternative, CSAV suggests that I.T.O. and Coastwide each owed it an independent duty of care which was breached when the crane was damaged. (CSAV's Mem.Mot.Summ.J. at 17.) CSAV does not specify the exact nature and extent of those duties. Assuming, however, that CSAV is correct, this Court still cannot infer from the stipulated facts which defendant's breach of duty caused the accident.

Even if this Court were to accept CSAV's view of the law, it would nevertheless have to

9. CSAV argues that because I.T.O. was a bailee of the crane at the time of the accident it had an obligation to "account for" the damage to the crane. (CSAV's Reply at 12.) CSAV overlooks the fact that a bailee may rebut the presumption of negligence that arises from the fact that goods were damaged while in his or her custody. *See Commercial Union Ins. Co. v. Bohemia River Associates, Ltd.*, 855 F.Supp. 802, 805 (D.Md.1991), and cases there cited. In the present case, I.T.O. has taken the position that any negligence was Coastwide's alone. *See* I.T.O.'s Opp. at 5–7. I.T.O. has demonstrated that a triable issue of fact exists with respect to that issue. Consequently, CSAV is not entitled to summary judgment on the basis that I.T.O. breached its duties as bailee.

deny CSAV's motion for summary judgment on its negligence claim. Only under rare circumstances does a plaintiff's circumstantial evidence not only permit, but also require, the inference that a defendant was negligent. In a decision which it later characterized as one which "cut through the mass of verbiage built up around the doctrine of *res ipsa loquitur*," *Jesionowski v. Boston & Maine R.R.*, 329 U.S. 452, 457, 67 S.Ct. 401, 404, 91 L.Ed. 416 (1947), the Supreme Court described the doctrine as follows:

> *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict.

*Sweeney v. Erving*, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913). *See also Stillman v. Norfolk & Western R.R. Co.*, 811 F.2d 834, 837 (4th Cir.1987) (quoting *Sweeney* ). Although, as CSAV has pointed out, there are cases in which the inference that the defendant was negligent is inescapable, this is not one of them. CSAV has not demonstrated that it is entitled to judgment as a matter of law on its negligence claims against either I.T.O. or Coastwide.

II. *Contract—Warranty of Workmanlike Performance.*

CSAV contends that I.T.O. breached its warranty of workmanlike performance. I.T.O. denies that it breached the warranty. I.T.O. also argues that "CSAV's decision to hire Coastwide, the party which negligently secured the crane to the flatrack," hindered I.T.O.'s ability to discharge its contractual duties and would relieve I.T.O. of any warranty liability that it might otherwise have incurred.

■ A stevedore owes a contractual duty to the shipowner "to perform the stevedoring operations in a workmanlike manner." *Salter Marine, Inc. v. Conti Carriers & Ter-*

*minals, Inc.*, 677 F.2d 388, 389 (4th Cir. 1982). *See also, e.g., Ryan Stevedoring Co., Inc. v. Pan–Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); *Italia Societa per Azioni·di Navigazione v. Oregon Stevedoring Co., Inc.*, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); *Seguros Illimani S.A. v. M/V POPI P*, 929 F.2d 89 (2d Cir.1991); *Heyman v. I.T.O. Corp.*, 1992 AMC 2654, 1992 WL 152470 (4th Cir.1992); *Matter of Robbins Maritime, Inc.*, 906 F.Supp. 309 (E.D.Va.1995) (collecting Fourth Circuit cases). A shipowner may base an action for indemnity upon the stevedore's alleged breach of its duty of workmanlike performance. *Ryan*, 350 U.S. at 132–135, 76 S.Ct. at 236–238; *Italia Societa*, 376 U.S. at 324, 84 S.Ct. at 754; *Seguros Illimani*, 929 F.2d at 92 (stating that a carrier's indemnity claim against the stevedore "arises from the warranty of workmanlike service implied by admiralty law from a carrier's contract with its stevedore."). Because the warranty action sounds in contract, rather than in tort, liability under the warranty is considerably different from liability for negligence. In particular, because "[c]ontract liability is a species of liability without fault," *Continental Grain Co. v. Puerto Rico Maritime Shipping Authority*, 972 F.2d 426, 438 (1st Cir.1992), the indemnitee need not establish the stevedore's negligence in the warranty action. Rather, "a stevedore can be found in breach of its warranty even in the absence of negligence in discharging its contractual duties." *Seguros Illimani*, 929 F.2d at 93.

■ Applying these principles, the Supreme Court in *Italia Societa* held a stevedore liable for injuries caused by a defective rope, even though "the defect . . . was latent and the stevedore free of negligent conduct in supplying the rope." *Italia Societa*, 376 U.S. at 323, 84 S.Ct. at 753. Observing that "a tort standard of negligence [is] inapplicable to the stevedore's liability under its warranty," 376 U.S. at 323–324, 84 S.Ct. at 753–754, the Court explained that "the issue of [a stevedore's] breach of the undertaking does not turn on whether the contractor knew or should have known that his equipment was safe, but on whether the equipment was in fact safe and fit for its intended use." 376

U.S. at 322, 84 S.Ct. at 752. Unlike liability in tort, which holds defendants financially responsible for injuries caused by their own fault, the stevedore's warranty liability achieves an "allocation of the losses caused by shipboard injuries to the enterprise, and within the several segments of the enterprise, to the institution or institutions most able to 'minimize the particular risk involved.'" 376 U.S. at 323, n. 10, 84 S.Ct. at 754 n. 10 (quoting *DeGioia v. United States Lines*, 304 F.2d 421, 426 (2d Cir.1962)).

CSAV relies for its warranty theory principally upon *Smith v. Jugosalvenska Linijska Plovidea*, 278 F.2d 176 (4th Cir.1960), and *Italia Societa*, 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732. (CSAV's Mem.Mot.Summ.J. at 15.) Seeking to distinguish these cases, I.T.O. points out that both involved injuries to seamen, and that in both, according to I.T.O., "the stevedore had actually supplied or assumed responsibility for the defective equipment at issue." (I.T.O. Opp. at 32.)

This Court agrees with I.T.O. that the interest in protecting injured seamen, a powerful influence in admiralty law, was present both in *Italia Societa* and in *Smith* and is absent from this property damage case. Moreover, the cases describing the scope of the stevedore's warranty liability speak generally of the stevedore's "obligation to perform with reasonable safety." *Italia Societa*, 376 U.S. at 319, 84 S.Ct. at 751. Although an argument could therefore be made that the warranty should apply more strictly against the stevedore in cases involving personal injury than in cases involving only injury to property, "the Fourth Circuit has continued to recognize the contractual duty of stevedores to provide workmanlike service in property damage cases." *Robbins Maritime*, 906 F.Supp. at 314 (collecting cases). Furthermore, in defining the scope of the warranty the Fourth Circuit has made no distinction between actions based on property damage and those based on personal injury. *See, e.g., Salter Marine*, 677 F.2d at 389–390 (citing, in a property damage case, *Ryan*, *Waterman S.S. Corp. v. Dugan & McNamara, Inc.*, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960), *Crumady v. The J.H. Fisser*, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d

413 (1959) and *Sanderlin v. Old Dominion Stevedoring Corp.*, 385 F.2d 79 (4th Cir. 1967), all personal injury cases). *Contra Continental Grain Co.*, 972 F.2d at 439 (refusing to apply the contractual warranty of workmanlike service in a property damage case in the First Circuit).

The Fourth Circuit's decision to construe the warranty of workmanlike service identically in property damage and personal injury cases is consistent with the general scheme of liability under the warranty. Although the present action involves only damage to property, it arises from an incident in which a crane weighing over 22,000 kilograms unexpectedly slipped from a mafi. The incident clearly could have caused serious personal injury. To further the policy of shifting warranty liability to "the party best situated to adopt preventive measures," *Italia Societa*, 376 U.S. at 324, 84 S.Ct. at 754, the Fourth Circuit appropriately applies identical principles of liability in both personal injury and property damage cases.

Accepting the stipulated facts and viewing the parties' other factual allegations in the light most favorable to I.T.O., this Court holds, as a matter of law, that I.T.O. breached its warranty of workmanlike service. Even assuming, as I.T.O. suggests, that negligent lashing by Coastwide was the primary factual cause of the accident, I.T.O. has stipulated that it "placed the flatrack on a mafi" and that an I.T.O. hustler operator was moving the crane when it fell. (Stipulation of Facts at 3.) I.T.O. has further stipulated that the contract between itself and CSAV, the contract that contains the implied warranty of workmanlike service, required it to "receive cargo for export, store such cargo prior to loading [and] transport such cargo from its storage location to the side of the ship." (*Id.* at 2.) Although I.T.O. asserts that a stevedore may not be held liable for damage caused by latent defects unless "the stevedore had actually supplied or assumed responsibility for the defective equipment at issue," I.T.O. has not cited a case from this circuit or from any other denying a shipowner recovery against a stevedore on such grounds. (I.T.O. Opp. at 32.) Moreover, by loading the allegedly improperly-lashed

crane onto the mafi and moving it towards the pier, I.T.O. had assumed sufficient control of the dangerously defective equipment, as a matter of law, to be liable under its warranty to CSAV. As the Court in *Italia Societa* explained, warranty liability favors the shipowner by imposing a broad liability upon the stevedore because "[w]here ... injury-producing and defective equipment is under the supervision and control of the stevedore, the shipowner is powerless to minimize the risk; the stevedore is not." 376 U.S. at 324, 84 S.Ct. at 754.

Lastly, I.T.O. argues that "CSAV's decision to hire Coastwide, the party which negligently secured the Crane to the flatrack, arguably hindered I.T.O.'s ability to perform in a workmanlike manner." (I.T.O.'s Opp. at 31.) Under certain circumstances, a stevedore may avoid warranty liability to a shipowner because of the shipowner's own negligence. The Court of Appeals for the Fourth Circuit has described the applicable principles as follows:

> "[R]ecovery in indemnity for breach of the stevedore's warranty is based upon an agreement between the shipowner and the stevedore and is not necessarily affected or defeated by the shipowner's negligence, whether active or passive, primary or secondary." [*Italia Societa*, 376 U.S. at 321, 84 S.Ct. at 752.] The test established by this circuit for determining whether the shipowner's negligence precludes indemnity is whether the shipowner's actions prevented or seriously handicapped the stevedore from performing its duties.

*Heyman v. I.T.O. Corp.*, 1992 AMC at 2656–2657; 1992 WL 152470.

I.T.O.'s argument lacks merit for two reasons. First, I.T.O. has failed to produce a scintilla of evidence regarding the alleged negligence, which I.T.O. characterizes as CSAV's decision to employ Coastwide to render lashing services. I.T.O. has produced no evidence to suggest that Coastwide's reputation was such that CSAV either knew or should have known that it ought not to hire Coastwide. Indeed, I.T.O. has made no factual allegations at all regarding the degree of care that CSAV exercised in hiring Coastwide.

Second, I.T.O. appears to assume that any negligence on the part of CSAV would constitute a defense to the indemnity action. The Court of Appeals, however, has held that a shipowner's negligence, established by jury verdict, did not bar the shipowner's indemnity action against the stevedore where the stevedore was directly responsible for the trailer that backed over the plaintiff. *Heyman*, 1992 AMC at 2656, 1992 WL 152470. Similarly, the negligence of the United States in failing to put out additional lines to secure a tanker did not bar the United States' indemnity action against a tug that negligently set the tanker adrift. *Tebbs v. Baker–Whiteley Towing Co.*, 407 F.2d 1055 (4th Cir.1969). *See also Salter Marine*, 677 F.2d at 390; *Robbins Maritime*, 906 F.Supp. 309 (E.D.Va.) (holding that shipowner's defective prestow plan did not exonerate stevedores from liability where the stevedores did not request permission to deviate from the plan.) Indeed, a shipowner's negligence is a bar to its action for indemnity against the stevedore only when that negligence is of a type that would "prevent or handicap the stevedore from discharging its duties" in handling the crane. *Old Dominion Stevedoring Corp.*, 386 F.2d at 197. I.T.O. has failed to allege facts which would permit a factfinder to conclude that CSAV's alleged negligence prevented or handicapped it from performing its contractual obligations.

Based on the stipulated facts, therefore, and the inferences drawn therefrom in favor of I.T.O., this Court holds, as a matter of law, that I.T.O. breached its implied warranty of workmanlike service. CSAV has therefore established the first and fourth elements of the indemnity action under *Vaughn*.

### B. *CSAV's Obligation to Satisfy the Underwriters' Claims.*

A plaintiff seeking indemnification in this Circuit must "demonstrate that it was under some compulsion to satisfy the claim of the original plaintiff." *Vaughn*, 937 F.2d at 956. The parties to the present action hotly dispute the level of "compulsion" to be established. I.T.O. takes the position that because CSAV failed to tender defense of the action

to I.T.O., CSAV must establish that it was actually liable to compensate the cargo underwriters for their loss. CSAV responds that it need only prove that it was potentially liable to the cargo underwriters. According to CSAV, even though it did not formally tender defense of the action to I.T.O., it nonetheless "gave [I.T.O.] sufficient opportunity to defend, but I.T.O. failed to avail itself of the opportunity." (CSAV's Mem.Mot. Summ.J. at 18.)

■ The parties have identified a difficult issue of law. On the one hand, an indemnitee is clearly required to establish its actual liability to the original plaintiff if it failed to give the proposed indemnitor notice of the underlying proceedings. *Jennings v. United States*, 374 F.2d 983 (4th Cir.1967). On the other hand, circumstances short of a formal tender of defense are sufficient to discharge the indemnitee's duty of notice, and to require proof in the indemnity action only of the indemnitee's potential liability to the original plaintiff. *Burke v. Ripp*, 619 F.2d 354 (5th Cir.1980). The parties to the present case have stipulated that I.T.O. was fully aware of the underwriters' threatened proceedings in Chile, that it disagreed with CSAV's decision to settle, and that "CSAV never expressly requested I.T.O. to assume the defense of cargo underwriters' claim." (Stipulation of Facts at 5.)

■ This Court need not determine whether CSAV must establish its actual liability to cargo underwriters or only its potential liability. The stipulated facts clearly demonstrate, as a matter of law, CSAV's actual liability to cargo underwriters. The Hamburg Rules provide for the liability of carriers as follows:

> The carrier is liable for loss resulting from ... damage to the goods ... if the occurrence which caused the ... damage ... took place while the goods were in his charge as defined in article 4, unless the carrier proves that he, his servants or agents took all measures that could reasonably be required to avoid the occurrence and its consequences.

Hamburg Rules, art. 5, § 1. A carrier is "in charge" of goods "from the time he has taken over the goods from ... the shipper, or a person acting on his behalf" until the time when the goods are delivered. *Id.*, art. 4, § 2(a). For the purposes of article 4, § 2, "reference to the carrier ... means, in addition to the carrier ... the servants or agents ... of the carrier." *Id.*, art. 4, § 3.

Under the Hamburg Rules, therefore, CSAV would be obliged to prove to cargo underwriters in Chile that there was no negligence either on its part, or on the part of Coastwide or I.T.O. Such a task would be insurmountable. No litigant in this case has argued that the damage to the crane did not occur as a result of negligence. There is no evidence that the crane toppled from the mafi because of a supervening event beyond the parties' control. Rather, CSAV argues that I.T.O. and Coastwide were negligent, I.T.O. argues that CSAV, Coastwide and Koehring were negligent, and Coastwide has filed a cross-claim against I.T.O. alleging that any liability on its part "is due, in part or in whole, to the negligence of I.T.O., their agents and servants." (Coastwide's Cross-claim, ¶ 3.) Under the circumstances, the undisputed facts reveal an extremely high probability that the crane was damaged by the failure of one of the defendants to take reasonable care. Because CSAV would be liable under the Hamburg Rules for the negligence of any of the defendants, except perhaps Atlantic, this Court holds, as a matter of law, that CSAV was under a compulsion to satisfy the cargo underwriters' claim in the threatened litigation in Chile.

C. *The Reasonableness of the Settlement.*

■ The final element of an indemnity action under *Vaughn* is proof that the indemnitee's "settlement with the plaintiff in the underlying action was reasonable." *Vaughn*, 937 F.2d at 957. I.T.O. contends that CSAV ought not have settled simply because it was threatened by a lawsuit which might never have materialized. Moreover, according to I.T.O., "[e]ven if such a lawsuit had been filed in Chile, CSAV had available to it a myriad of defenses to that suit, one or more of which might have been successful." (I.T.O.'s Opp. at 28.) I.T.O. specifies that such defenses include the possible application of COGSA to bar the action and the chance that "a pre-

emptive declaratory judgment in the United States should be recognized by the Chilean court." (*Ibid.*)

CSAV is required in this action to prove that its settlement was reasonable, not that its defeat in potential litigation was an absolute certainty. I.T.O.'s contentions that the suit might never have been filed or that some defense "might have been successful" do not create a material issue of fact with regard to the reasonableness of CSAV's decision to settle. The parties have stipulated that CSAV was threatened with suit in Chile. The stipulated facts establish CSAV's liability, as a matter of law, to cargo underwriters in a suit brought in a Chilean court. Under the circumstances, CSAV was obliged neither to wait until it was sued in Chile nor to pursue a risky and expensive litigation strategy in the United States.

The parties have stipulated that cargo underwriters paid insurance proceeds of $90,444.34 for the damage to the crane, and sought full reimbursement from CSAV. CSAV settled with cargo underwriters for $65,000. I.T.O. does not argue that the amount of CSAV's settlement with cargo underwriters was unreasonable.

Under the circumstances, the stipulated facts reveal that CSAV's settlement with cargo underwriters in Chile was reasonable as a matter of law.

### Conclusion

CSAV has established that it is entitled to summary judgment against I.T.O. Based on the stipulated and otherwise undisputed facts, there is no issue for trial with regard to any element of the action against I.T.O. for indemnification and CSAV is entitled to judgment against I.T.O. as a matter of law. Accordingly, CSAV's motion for summary judgment against I.T.O. *shall be,* and it hereby *is, granted.*

CSAV is not entitled to summary judgment against defendant Coastwide. CSAV has failed to establish, as a matter of law, that Coastwide was negligent. CSAV's motion for summary judgment against Coastwide is therefore *denied.*

Only CSAV has addressed the issue of damages. CSAV asserts that it is entitled to recover damages, prejudgment interest and the cost of defending the claim in Chile. CSAV has not requested a specific amount of damages. Instead, it has offered to submit evidence of the amount of its damages after this Court's disposition of the cross-motions for summary judgment. (CSAV Mot. Summ.J. at 21.)

This Court directs CSAV and I.T.O. to try to reach an agreement on the amount of damages. They are to report whether they have agreed upon an amount within twenty-one days of the date hereof. In the event of a failure to reach agreement, the parties may file motions for summary judgment on the amount of damages on or before October 21, 1996. Responsive briefs will be due on October 26, 1996. No further briefing will be entertained.

It is so ordered.

### MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

This action is before the Court on defendant I.T.O. Corporation of Baltimore's Motion for Reconsideration. I.T.O. asks this Court to reconsider its Order of September 18, 1996, granting summary judgment against I.T.O. in favor of plaintiff Compañia Sud Americana De Vapores, S.A., (CSAV). I.T.O. articulates the following objections to this Court's Order; 1) that there is no basis in fact or law for the Court's holding that I.T.O. breached its warranty of workmanlike performance; 2) that the Court erred in holding that CSAV had established the elements of an indemnity action in this circuit; and 3) that if the Court properly entered summary judgment against I.T.O. it should likewise have entered summary judgment against I.T.O.'s co-defendant, Coastwide Cargo Securing Co., Inc. (Coastwide). For the reasons set forth in this Court's Memorandum Opinion of September 18, I.T.O.'s arguments lack merit. In light of I.T.O.'s evident confusion with regard to the rationale of the Court's decision, however, this Court will repeat and briefly explain the logical components of its decision.

As a threshold matter, it should be noted that I.T.O.'s motion for reconsideration repeatedly refers to "findings of fact made by this Court in its Memorandum Opinion." (*See, e.g.,* I.T.O. Mem.Mot.Recon. at 16.) Contrary to I.T.O.'s suggestion, this Court made no factual findings in its opinion, nor would it have been appropriate for the Court to do so. The matter was before the Court on cross-motions for summary judgment. The Court therefore based its decision solely upon the numerous facts which were either stipulated by the parties or were otherwise not in dispute.

I.T.O. attacks on numerous grounds this Court's holding that I.T.O. breached its contractual warranty of workmanlike service to CSAV. First, I.T.O. invites this Court to revise the legal basis for its decision because "the Fourth Circuit is in a distinct minority among other Courts of Appeals in this country" in continuing to recognize an implied warranty of workmanlike performance in property damage cases. (I.T.O. Mem. at 4, n. 1.) Be that as it may, Fourth Circuit law is binding upon this Court. I.T.O.'s invitation to disregard Fourth Circuit precedent is therefore declined.

Next, I.T.O. insists that in warranty cases courts require "some evidence of a breach of the implied warranty by the stevedore, as demonstrated by *proof of some improper conduct* on the part of the stevedore." (I.T.O. Mem. at 4 (emphasis added).) This proposition is, quite simply, false. Indeed, the Supreme Court of the United States and the federal Courts of Appeals have repeatedly emphasized that liability under the stevedore's warranty is liability without fault, and, in particular, that warranty liability does not require a finding that the stevedore was negligent. *See* September 18, 1996 Memorandum Opinion, Slip Op. at 19–20 (citing and quoting cases). Therefore, I.T.O. is in error when it suggests that this Court may only hold it liable for breach of warranty if I.T.O. "*improperly* placed the flatrack on the mafi"

or "*improperly* mov[ed] the crane." (I.T.O. Mem. at 6, emphasis in original.)

I.T.O.'s reliance upon the Supreme Court's decision in *Exxon v. Sofec,* —— U.S. ——, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996), is likewise misplaced. According to I.T.O., the *Exxon* case requires this Court to find that "an improper act by I.T.O. proximately caused the accident" to the crane. (I.T.O.'s Mem. at 9.) *Exxon*'s holding, however, was carefully set forth by the Supreme Court as follows:

> "where the injured party is the sole proximate cause of the damage complained of, that party cannot recover in contract from a party whose breach of warranty is found to be a mere cause in fact of the damage."

116 S.Ct. at 1819. The issue in *Exxon* was whether certain parties were exonerated from possible warranty liability because the supervening negligence of a ship's captain had been found by the trial court to have been the "sole proximate cause" of the damage complained of. Unlike *Exxon,* the present case involves no issues of supervening causation. I.T.O.'s confusion apparently arises from its belief that unless this Court identifies the specific act of I.T.O. that constituted its breach of warranty, this Court cannot determine that such breach proximately caused the injury to the crane. For the reasons that follow, I.T.O. is mistaken.

I.T.O. acknowledges the Court's holding that the accident could have been the result of a) I.T.O.'s sole negligence; b) Coastwide's sole negligence, or c) the concurrent negligence of I.T.O. and Coastwide. (I.T.O.'s Mem. at 8.)[1] Because I.T.O. would incur warranty liability to CSAV under *any* of the foregoing scenarios, including the new, fourth alternative, it is liable to CSAV regardless of what actually transpired. Moreover, however I.T.O. breached its warranty, it is clear, as a matter of law, that I.T.O.'s breach proximately caused the injuries to the crane.

Taking each possible factual scenario in turn, the Court's analysis is as follows. Sce-

---

**1.** I.T.O. now poses a fourth possibility, that the accident was the result of the defendant Koehring's sole negligence. As this Court pointed out in its Memorandum Opinion, no litigant in this case takes the position that the damage to the crane did not occur as a result of *someone's* negligence. Slip Op. at 25.

nario a): if I.T.O. was negligent, then it could incur warranty liability by virtue of its own improper act. Scenario b): if Coastwide, whose obligation it was to lash the crane to the flatrack, was negligent, then I.T.O. transported an improperly lashed crane towards the pier. Just as a stevedore is liable for breach of its warranty when it supplies a defective rope, even though it does not know that the rope is defective and it is not negligent in supplying it, so too is a stevedore liable for injuries resulting from its transportation of an improperly lashed crane, even if it has no knowledge of the improper lashing and is not negligent in failing to discover the dangerous condition.[2] *See Italia Societa per Azioni di Navigazione v. Oregon Stevedoring, Inc.,* 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964). Scenario c): if both Coastwide and I.T.O. were negligent, then I.T.O. could incur liability both by failing to take reasonable care and by transporting an improperly lashed crane.

Under each set of possible circumstances, I.T.O.'s breach of warranty would be a proximate cause of the injury to the crane. I.T.O.'s own negligence would, by definition and as a matter of law, include proximate causation of the damage complained of. Likewise, if I.T.O. breached its warranty by transporting a crane which was improperly lashed to the flatrack, then I.T.O.'s breach, as a matter of law, proximately caused the damage to the crane as it fell to the pier.

I.T.O. concludes the first section of its argument by stating that "CSAV has failed to meet its burden of proving that I.T.O. did anything improper in its handling of the crane." (I.T.O.'s Mem. at 13.) Proof of improper conduct is not a necessary element of the cause of action based on breach of warranty. Consequently, to the extent that I.T.O.'s motion for reconsideration is based upon CSAV's failure to allege and prove a specific act of negligence or other fault, the motion must be denied.

I.T.O.'s next theory is that the Court's grant of summary judgment was premature because the parties' requested stay of discovery prevented I.T.O. from ascertaining facts to show that CSAV is liable under a *respondeat superior* theory for any negligent act committed by Coastwide. Specifically, I.T.O. contends that "this Court found that CSAV's liability was governed by the Hamburg Rules, and that ... under the Hamburg Rules, CSAV was liable for the negligence of its 'servants or agents.'" (I.T.O.'s Mem. at 17.) Contrary to I.T.O.'s suggestion, however, this Court did *not* hold that this action is governed by the Hamburg Rules. The Court held only that a court *in Chile* would have applied the Hamburg Rules to litigation between the cargo underwriters and CSAV. Indeed, it seems clear that the Hamburg Rules do not govern the liability of the parties to the present action.[3]

I.T.O. next argues that CSAV failed to establish, as a matter of law, the elements of an indemnity action under *Vaughn v. Farrell Lines, Inc.,* 937 F.2d 953 (4th Cir.1991). Because I.T.O.'s argument in this regard is based upon its complaint that "CSAV did not prove ... that I.T.O. committed some improper act in handling the crane that constituted a breach" of the warranty, the argument is without merit for the reasons set forth above.

Lastly, I.T.O. asserts that if this Court's grant of summary judgment is, in fact, proper, then this Court must also grant summary judgment against Coastwide on the theory that it also breached the warranty of workmanlike performance. According to I.T.O., there is "no rational basis on which this Court could have found that I.T.O. had breached the warranty without finding that Coastwide ... had breached its own warranty of workmanlike performance." (I.T.O.'s Mem. at 28.) To do so would be, in I.T.O.'s opinion, to apply "two different liability stan-

---

2. This Court hereby clarifies that it is making no factual findings but is, rather, analyzing the case under all available hypotheses. It should be clear that the analysis that applies to liability based on Coastwide's sole negligence is equally applicable to liability based on Koehring's sole negligence.

3. Apart from the possible application of the Hamburg Rules, there is absolutely no basis for I.T.O.'s *respondeat superior* theory. It is clear from the stipulated and uncontroverted facts that Coastwide was not CSAV's employee but, rather, an independent contractor.

dards to identical claims brought by CSAV against virtually identical defendants." (*Id.* at 30.)

Contrary to I.T.O.'s contentions, I.T.O. and Coastwide are not "virtually identical" defendants for purposes of warranty liability. I.T.O. has stipulated that Coastwide is a company "in the business of lashing and otherwise securing cargo" and that it lashed the Koehring crane to the flatrack. (Stipulation of Facts at 1.) I.T.O. does not suggest that Coastwide had any other involvement with the crane. For the purposes of the present motion this Court will assume, as I.T.O. suggests, that during the lashing process Coastwide would be liable, without fault, for its acts resulting in damage to the crane.[4] Nevertheless, unlike I.T.O., Coastwide would not incur warranty liability to CSAV under every possible scenario which is consistent with the stipulated and undisputed facts. In particular, if I.T.O. alone was negligent, and if its negligence occurred after Coastwide had completed its work on the crane (for example, if I.T.O. negligently placed the flatrack on the mafi), then Coastwide simply would not be liable to CSAV, even under a warranty theory, because there would have been no breach by Coastwide. Consequently, CSAV failed to establish Coastwide's breach of warranty as a matter of law and summary judgment against Coastwide was properly denied.

Although I.T.O. is obviously aggrieved by what it perceives to be an unjust decision against it, that decision is a necessary consequence of applying the law of this Circuit to the stipulated and undisputed facts of the case. For the foregoing reasons, I.T.O.'s motion for reconsideration of this Court's decision of September 18, 1996, SHALL BE, and it hereby IS, *denied.*

It is so ordered.

---

**4.** For example, if Koehring's negligence had rendered the crane unsafe, and if Coastwide, without fault, had handled the crane so as to cause damage, then Coastwide might have incurred liability under the warranty theory posited by I.T.O.